Mildred K. O'Linn, Esq. (State Bar No. 159055)
Tony M. Sain, Esq. (State Bar No. 251626)
Steven J. Renick, Esq. (State Bar No. 101255)
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER** LLP
15th Floor at 801 Tower
801 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 624-6900
Facsimile: (213) 624-6999
mko@manningllp.com; tms@manningllp.com; sjr@manningllp.com

Attorneys for Defendant
CITY OF COLTON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF HUTALIO SERRANO-GRANADOS, by and through its personal representative GABRIELA SERRANO; GABRIELA SERRANO (for herself); B.S., G.L.S., and G.S., minor children of Plaintiffs' Decedent, by and through their Guardian ad Litem GABRIELA SERRANO, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF COLTON, a public entity; DOES 1 through 10, individually and in their official capacity as police officers for the CITY OF COLTON, <br><br> Defendants. | Case No.: EDCV13-519-JAK(OPx) <br> *[Assigned to District Judge John Kronstadt and Magistrate Judge Oswald Parada]* <br><br> **EX PARTE APPLICATION:** <br> **1) TO DISQUALIFY PLAINTIFFS' EXPERT RONALD L. O'HALLORAN, M.D. AND, IF THE COURT DEEMS APPROPRIATE, PLAINTIFFS' COUNSEL JORGE GONZALEZ;** <br> **or, in the alternative** <br> **2) TO SHORTEN TIME FOR THE HEARING OF A MOTION REQUESTING SUCH RELIEF;** <br> **or, in the alternative** <br> **3) SETTING THIS MATTER FOR HEARING ON NORMAL NOTICE FOR A MOTION AND EXTENDING THE DEADLINE FOR DEFENDANT TO DEPOSE PLAINTIFFS' EXPERT WITNESSES UNTIL A DATE AFTER THE COURT RULES ON SUCH A MOTION; DECLARATION OF TONY M. SAIN; DECLARATION OF STEVEN J. RENICK; EXHIBITS; [PROPOSED] ORDER** |

Defendant CITY OF COLTON hereby applies *ex parte* for an order 1) to disqualify plaintiffs' expert Ronald L. O'Halloran, M.D. and, if the Court deems

-i-

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd
**EX PARTE APPLICATION: 1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

appropriate, plaintiffs' counsel Jorge Gonzalez; or, in the alternative 2) to shorten time for the hearing of a motion requesting such relief; or, in the alternative 3) setting this matter for hearing on normal notice for a motion and extending the deadline for defendant to depose plaintiffs' expert witnesses until a date after the court rules on such a motion.

This motion is made on the ground that the plaintiffs and their counsel, through Dr. O'Halloran, have gained knowledge of defense counsel's confidential attorney work product.

Ex parte consideration of the issues raised by this application is necessary because it was impossible to have a regularly scheduled motion seeking the relief requested herein heard prior to the expert discovery cut-off date of May 30, 2014.

This application is based on this notice; the attached memorandum of points and authorities; the accompanying declaration of Tony M. Sain; and all pleadings, papers, and records on file in this action.

Counsel for the plaintiff, identified below, have advised defense counsel that they oppose this application.  The names, addresses, telephone numbers, and e-mail addresses of counsel for the plaintiffs are as follows:

Francisco A. Suarez, Esq.
Law Offices of Francisco A. Suarez
301 W. Mission Boulevard
Pomona, California 91766
Tel: (909) 469-5111
Fax: (909) 469-5113
*francisco.a.suarez@verizon.net*
*francisco.suarez.lawoffice@gmail.com*

Jorge Gonzalez, Esq.
A Professional Corporation
2485 Huntington Drive, Suite 238
San Marino, California 91108
Tel: (213) 598-3278
*jggorgeous@aol.com*

Dated:  May 20, 2014

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

By:  */s/  Tony M. Sain*
MILDRED K. O'LINN
TONY M. SAIN
STEVEN J. RENICK

Attorneys for Defendant
CITY OF COLTON

-ii-

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . .  1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

1.    THE RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

2.    TO MAINTAIN THE INTEGRITY OF THE ADVERSARY PROCESS,
      THE COURT  HAS THE INHERENT POWER TO DISQUALIFY
      EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

3.    DR. O'HALLORAN IN HIS REPORT ADDRESSES IN DETAIL
      MANY OF THE ISSUES HE DISCUSSED WITH DEFENSE
      COUNSEL AND REGARDING WHICH HE RECEIVED
      CONFIDENTIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

4.    DR. O'HALLORAN SHOULD BE DISQUALIFIED FROM ACTING
      AS AN EXPERT FOR THE PLAINTIFFS HERE . . . . . . . . . . . . . . . . . . .  12

5.    THE COURT SHOULD CONSIDER WHETHER PLAINTIFFS'
      COUNSEL JORGE GONZALEZ SHOULD ALSO BE DISQUALIFIED . .  14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

DECLARATION OF TONY M. SAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

# TABLE OF AUTHORITIES

***CASES***                                                                                              ***Page***

*Advanced Cardiovascular Sys. v. Medtronic, Inc.,*
      1998 U.S. Dist. LEXIS 2556 (N.D. Cal. Feb. 27, 1998)  . . . . . . . . . . . . . . . . . 7

*Kane v. Chobani, Inc.,* 2013 U.S. Dist. LEXIS 109900
      (N.D. Cal. Aug. 2, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*North Pacifica, LLC v. City of Pacifica,* 335 F.Supp.2d 1045
      (N.D. Cal. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Plumley v. Doug Mockett & Co.,* 2008 U.S. Dist. LEXIS 105634
      (C.D. Cal. Dec. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ross v. Am. Red Cross,* 2014 U.S. App. LEXIS 1827 (6th Cir. 2014) . . . . . . . . 8, 13

*Shadow Traffic Network v. Superior Court,*
      24 Cal.App.4th 1067 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9, 12, 14, 15

*Space Systems/Loral v. Martin Marietta Corp.,*
      1995 U.S. Dist. LEXIS 22305 (N.D. Cal. Nov. 14, 1995) . . . . . . . . . . . . . . . 7

*Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.,*
      2006 U.S. Dist. LEXIS 97164 (C.D. Cal. Nov. 6, 2006) . . . . . . . . . . . . . . . . 7

*Wang Laboratories, Inc. v. Toshiba Corp.,*
      762 F.Supp. 1246 (E.D. Va. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The plaintiffs recently designated as one of their expert witnesses in this case Dr. Ronald L. O'Halloran, even though plaintiffs' counsel Jorge Gonzalez knew that Dr. O'Halloran had already had a discussion with defense counsel about acting as an expert witness for the defendant in this very case. Plaintiffs' counsel asserts that this prior contact presented no problem because Dr. O'Halloran advised plaintiffs' counsel that he and defense counsel Tony M. Sain had not engaged in "substantive" discussions regarding the case. But Mr. Gonzalez did not bother to confirm that with Mr. Sain.

If he had, Mr. Gonzalez would have discovered that Dr. O'Halloran's recollection was in error. Dr. O'Halloran had in fact had a lengthy discussion with Mr. Sain about the case, lasting more than half-an-hour. Based on their work together on a prior case, Mr. Sain asked Dr. O'Halloran if he would be willing to provide him with his preliminary impressions about the case, which Dr. O'Halloran agreed to do at no charge.

Mr. Sain then not only discussed the facts of the case, but also his impressions and analysis of that evidence (including the coroner's deposition), the defendant City's potential trial strategies, and their thoughts about plaintiffs' counsel and his litigation style. At the end of their discussion, Mr. Sain advised Dr. O'Halloran that he would like to retain him as an expert, subject to the approval of the client, and Dr. O'Halloran agreed to serve as an expert for the defendant in this case. Mr. Sain also asked Dr. O'Halloran to keep their conversation confidential, and Dr. O'Halloran agreed.

The conversation between Mr. Sain and Dr. O'Halloran was far more than a brief conversation to inquire about the witness's availability to serve as an expert. Dr. O'Halloran was provided confidential information about defense counsel's analysis of the case and their trial strategies, and he understood that this was provided to him on a confidential basis and that Mr. Sain expected him to keep that information confidential – to which Dr. O'Halloran agreed. Yet he then agreed to serve as an expert witness for

the opposing party in the same case, without any notice being given to the defendant, much less obtaining the defendant's consent.

Given the facts and the applicable case law, the situation calls for Dr. O'Halloran to be disqualified from continuing to act as an expert for the plaintiffs in this action. Further, this Court should consider whether the circumstances require that plaintiffs' counsel Jorge Gonzalez also be disqualified, for the same reasons.

Ex parte consideration of the issues raised by this application is necessary because of the expert discovery cut-off date of May 30, 2014.  By the time defense counsel became aware that the plaintiff had designated Dr. O'Halloran as an expert witness (late in the afternoon on Friday May 2), it was already 28 days prior to that cut-off date, thereby making it unfeasible to prepare a regularly scheduled motion seeking to disqualify Dr. O'Halloran heard prior to the cut-off date while also complying with the Court's meet-and-confer rules.  [*See* U.S. Dist., C.D. Cal. L-R 7-3.]  One of the alternative options for relief suggested by the defendant City in this application is to extend that expert discovery deadline so that this application can be heard as a noticed motion rather than on an ex parte basis.  Declaration of Tony M. Sain, paragraph 21.

## 1.    THE RELEVANT FACTS

In December, 2013, defense counsel Tony M. Sain contacted Ronald L. O'Halloran, M.D., a medical examiner/expert he had retained and used in a prior case. They spoke by phone on December 17, 2013 for over 36 minutes about this case. Declaration of Tony M. Sain, paragraphs 2-3, 9-10 and Exhibits B and C.

During that call, Mr. Sain identified the parties involved in the case and asked Dr. O'Halloran if anyone else had contacted him about the case: he responded that no one else had contacted him.  Mr. Sain then told Dr. O'Halloran that his firm was considering retaining Dr. O'Halloran to act as a defense expert in the Serrano case for several reasons: (a) His work with the firm on a prior case had been very good; (b) Mr. Sain understood from their prior work together that Dr. O'Halloran was not a fan of the

-2-
**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

"excited delirium" diagnosis in general, and Mr. Sain explained to Dr. O'Halloran that he suspected the doctor might be able to explain the death of the decedent in this matter more simply in terms of the drug toxicology issues of the case; and (c) Mr. Sain understood from their prior conversations that Dr. O'Halloran was not a fan of TASERs and that Mr. Sain believed that Dr. O'Halloran's skepticism of TASERs would be useful in this case, because Mr. Sain suspected that Dr. O'Halloran would agree that TASERs could not have been a cause or contributor to the death of the decedent in this matter. Declaration of Tony M. Sain, paragraph 3.

Mr. Sain explained to Dr. O'Halloran that even though his client had not yet authorized him to retain Dr. O'Halloran in the *Serrano* matter, Mr. Sain was hoping that Dr. O'Halloran could provide him with the doctor's "knee-jerk" impressions about the case, which would enable Mr. Sain to formulate a formal recommendation to his client about retaining Dr. O'Halloran. Dr. O'Halloran agreed to provide Mr. Sain with his preliminary impressions about the case at no charge. Declaration of Tony M. Sain, paragraph 4.

Mr. Sain then disclosed to Dr. O'Halloran the decedent's toxicology results, the coroner's conclusions as to the cause of death, and summarized the deposition testimony of the coroner (Deputy Medical Examiner Glenn E. Holt, M.D.) that Mr. Sain had just taken on December 5, 2013. At the time of the telephone conversation between Mr. Sain, and Dr. O'Halloran, the transcript of the coroner's deposition had not yet been delivered to Mr. Sain, so his comments to Dr. O'Halloran were based on Mr. Sain's memory of the testimony given by Dr. Holt at that deposition – and included Mr. Sain's observations and analysis of that testimony. Mr. Sain in particular drew Dr. O'Halloran's attention to the fact that the coroner had excluded TASER electricity, asphyxia, blunt force trauma, or restraint/action by the officers (as opposed to resistance to restraint by the decedent) as causes or contributing factors in the death of the decedent, and commented about the tactical significance these findings would have in the defense of this action. Declaration of Tony M. Sain, paragraph 5.

During his conversation with Dr. O'Halloran, Mr. Sain also explained that it was currently unclear to defense counsel what theory of the cause of the decedent's death the plaintiffs would pursue at trial, but that they anticipated that plaintiffs' counsel would likely pursue a TASER-shocked-to-death theory or a compression asphyxia theory. Mr. Sain stated to Dr. O'Halloran that based on defense counsel's evaluation of the evidence, they believed that the evidence would not support either potential theory, because the decedent had continued to vocalize and actively resist the officers for several minutes after the last TASER discharge, and because there was no witness testimony that supported the notion that the officers had their body weight on the decedent's upper torso. Declaration of Tony M. Sain, paragraph 6.

Mr. Sain advised Dr. O'Halloran that the attorney for the plaintiffs in the Serrano case – Jorge Gonzalez – had also been the plaintiff's counsel in the prior case he and Dr. O'Halloran had worked on together (*Munoz*). He discussed with Dr. O'Halloran Mr. Gonzalez's litigation style, comparing it to how Mr. Gonzalez had handled the prior litigation. Declaration of Tony M. Sain, paragraph 6.

After providing to Dr. O'Halloran these facts and defense counsel's impressions and analysis regarding those facts, Mr. Sain asked Dr. O'Halloran for his initial impressions about the case. Dr. O'Halloran responded that his inclination would be to call the death one due to drug toxicity. They then discussed the general merits of explaining to a jury a more familiar cause of death – drug toxicity – than a cause of death – excited delirium – less familiar to lay people. Mr. Sain discussed with Dr. O'Halloran his personal views about the challenges presented by the need to explain to lay jurors the meaning and significance of the diagnosed cause of death – excited delirium – as compared to presenting an easier-to-understand cause of death – drug toxicity – which Mr. Sain believed the evidence also supported. Declaration of Tony M. Sain, paragraph 7.

Mr. Sain then asked Dr. O'Halloran if he would be willing to help out the defendant as an expert in either the initial expert disclosures phase or the rebuttal phase

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

**EX PARTE APPLICATION: 1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

of the case, and/or possibly with a declaration supporting the motion for summary judgment the defendant anticipated filing in this action.  Dr. O'Halloran responded that would be willing to do any of that.  Mr. Sain then explained to Dr. O'Halloran that his plan was to consult with lead defense attorney Mildred K. O'Linn and with the client about retaining him for the Serrano matter and that Mr. Sain planned to recommend that Dr. O'Halloran be retained as a defense expert witness in this matter.  Mr. Sain also advised Dr. O'Halloran of the trial dates/schedule and asked him to try to keep his calendar clear.  Mr. Sain asked Dr. O'Halloran to keep their conversation confidential and he agreed.  Declaration of Tony M. Sain, paragraph 8.  Mr. Sain then immediately memorialized his conversation with Dr. O'Halloran in an email.  Declaration of Tony M. Sain, paragraph 9.  Dr. O'Halloran ultimately was not retained by the defendant to act as an initial expert in this matter.  Declaration of Tony M. Sain, paragraph 11.  (However, Mr. Sain was considering whether there might be a need to retain Dr. O'Halloran as a rebuttal expert, depending on plaintiffs' expert disclosures.)

Defense counsel was then shocked thereafter to see Dr. O'Halloran designated by the plaintiffs as one of their expert witnesses in this case.  Declaration of Tony M. Sain, paragraph 12.  Neither Mr. Sain nor any other attorney in his firm had received any prior communication from either Dr. O'Halloran or any of plaintiffs' attorneys that the plaintiffs were contemplating retaining Dr. O'Halloran.  If defense counsel had been contacted, they would have objected to the plaintiffs retaining Dr. O'Halloran in light of the confidential information about the case he had been given, including the thoughts and impression of defense counsel about the evidence and the potential defense trial strategies for this matter.  Declaration of Tony M. Sain, paragraph 13.

Once defense counsel learned of the designation of Dr. O'Halloran, they contacted plaintiffs' counsel and asked them to withdraw Dr. O'Halloran: and defendant offered to stipulate to a joint request to permit plaintiffs more time to retain a replacement medical expert.  However, plaintiffs' counsel refused, necessitating this application.  Declaration of Tony M. Sain, paragraphs 14-19.

## 2.     TO MAINTAIN THE INTEGRITY OF THE ADVERSARY PROCESS, THE COURT HAS THE INHERENT POWER TO DISQUALIFY EXPERTS

"Analysis properly begins with an acknowledgment of the inherent power of federal courts to disqualify experts in certain circumstances. This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process

While the existence of the disqualification power is clear, its exercise presents more difficult issues in certain circumstances. To be sure, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification. Less clear are those cases where, as here, the parties dispute whether the earlier retention and passage of confidential information occurred. In this event, courts should undertake a two-step inquiry:

First, was it objectively reasonable for the first party who claims to have retained the consultant ... to conclude that a confidential relationship existed?

Second, was any confidential or privileged information disclosed by the first party to the consultant?

Affirmative answers to both inquiries ***compel*** disqualification."

*Wang Laboratories, Inc. v. Toshiba Corp.,* 762 F.Supp. 1246, 1248 (E.D. Va. 1991)

(emphasis added, citations omitted).

"Lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended. Fairness requires this. Fairness also requires that consultants with doubts about their desire to be retained should express these doubts clearly and unequivocally to the inquiring lawyer and decline to accept any disclosures unless and until the doubts are resolved.   In sum, the two-step inquiry employed here adequately protects confidentiality within the lawyer-consultant relationship while, at the same time, it effectively prevents lawyers from engaging in the impermissible practice of retaining consultants merely to preclude opposing counsel from doing so."

*Id.* at 1248-1249.

"There is no bright-line rule for expert disqualification.  Rather, courts balance the policy objectives that favor disqualification – ensuring fairness and preventing conflicts of interest – against policies militating against disqualification, including guaranteeing that parties have access to witnesses who possess specialized knowledge and allowing witnesses to pursue their professional callings.

Courts have recognized that disqualification may be appropriate ... when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of

**EX PARTE APPLICATION: 1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

their employment.  Courts generally disqualify an expert based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation.  In addition to these two factors, the Court also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process."

*Kane v. Chobani, Inc.,* 2013 U.S. Dist. LEXIS 109900, *16-*17 (N.D. Cal. 2013).

In conducting their analyses of whether a party's expert should be disqualified based on his or her prior contacts with opposing counsel, a number of California district courts have relied on the seminal California state case on the issue *Shadow Traffic Network v. Superior Court,* 24 Cal.App.4th 1067 (1994).  *See, e.g., Kane, supra,* 2013 U.S. Dist. LEXIS 109900 at *25, *29-*34,*36-*37, *45, *48, *51-*52, *55; *Plumley v. Doug Mockett & Co.,* 2008 U.S. Dist. LEXIS 105634, *10-*11 (C.D. Cal. 2008); *Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.,* 2006 U.S. Dist. LEXIS 97164, *13 (C.D. Cal. 2006); *North Pacifica, LLC v. City of Pacifica,* 335 F.Supp.2d 1045, 1051-1052 (N.D. Cal. 2004); *Advanced Cardiovascular Sys. v. Medtronic, Inc.,* 1998 U.S. Dist. LEXIS 2556, *5 (N.D. Cal. 1998); and *Space Systems/Loral v. Martin Marietta Corp.,* 1995 U.S. Dist. LEXIS 22305, *14 (N.D. Cal. 1995).

In *Shadow Traffic,* the plaintiff's attorneys had consulted with "representatives from Deloitte & Touche,  a 'Big-Six' accounting firm, to discuss the possible retention of individuals from that firm as expert witnesses to testify in the upcoming trial." *Id.* at 1071.  They later decided not to retain Deloitte & Touche as experts in the case. *Id.* at 1072.  Thereafter, defense counsel also contacted Deloitte & Touche and ended up hiring them as experts in the case, even though the defendants were informed that plaintiff's counsel had previously consulted with the firm about serving as their expert.  *Ibid.* When plaintiff's counsel learned of the retention of Deloitte & Touche by the defendant, the plaintiff moved to disqualify defense counsel.  It was unnecessary for it to move to disqualify Deloitte & Touche, because the firm had withdrawn from the case. *Id.* at 1072-1073.

-7-

The California Court of Appeal affirmed the trial court's order disqualifying defense counsel. *Id.* at 1071. The appellate court held that ***"communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality."*** *Id.* at 1080 (emphasis added, footnote omitted). The Court concluded "that substantial evidence supports the trial court's implicit finding that [plaintiff's counsel] imparted confidential information to Deloitte & Touche even though Metro subsequently chose not to retain the firm as an expert witness." *Id.* at 1084.

As to whether this confidential information was then disclosed to defense counsel, the appellate court wrote that:

> "Deloitte & Touche was privy to confidential information about Metro's action against Shadow, including counsel's theories on damages. Damages was the very topic Bottger conceded he had discussed with Thompson. Even assuming that Bottger did not expressly ask Thompson about the contents of his discussion with Andrews & Kurth and that Thompson did not explicitly disclose the information to Bottger, Bottger could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice Thompson rendered to Shadow. Given that both Metro and Shadow consulted Thompson on the same issue – Metro's damages – it is highly unlikely that Thompson could conscientiously discharge his duty to Shadow as its retained expert and at the same time discharge his duty not to divulge confidential information received from Metro. [Citation.]"

*Id.* at 1086.

The decision in *Shadow Traffic* is consistent with the two-part test that has generally been accepted for determining whether an expert should be disqualified.

> "Courts generally apply a two-step inquiry to determine whether disqualification is proper. First, the court asks whether the adversary had a confidential relationship with the expert. Second, the court asks whether the adversary disclosed confidential information to the expert that is relevant to the current litigation. Some courts also consider policy objectives favoring disqualification, including preventing conflicts of interest and maintaining the integrity of the judicial process."

*Ross v. Am. Red Cross,* 2014 U.S. App. LEXIS 1827, *17-*18 (6th Cir. 2014); citations omitted.

///

-8-

**EX PARTE APPLICATION: 1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

As will be discussed below, the circumstances regarding the plaintiffs' retention of Dr. O'Halloran are indistinguishable from those in *Shadow Traffic,* and so the same resolution of the situation is called for here.

### 3.  DR. O'HALLORAN IN HIS REPORT ADDRESSES IN DETAIL MANY OF THE ISSUES HE DISCUSSED WITH DEFENSE COUNSEL AND REGARDING WHICH HE RECEIVED CONFI-DENTIAL INFORMATION

Plaintiffs' counsel has contended in his letters and phone conversation with defense counsel that Dr. O'Halloran disputes that any "substantive" discussion regarding the case took place between him and defense counsel Tony Sain.  But Mr. Sain does not simply offer his contrary recollection on this point: he provides supporting evidence for his version of the conversation, namely his contemporaneous email regarding the conversation and the phone record showing that the conversation lasted for ***more than 36 minutes***.

A comparison of Dr. O'Halloran's report with defense counsel Tony Sain's description of his conversation with the doctor reveals that the report addresses many of the issues discussed in that conversation and regarding which Dr. O'Halloran received confidential information.  For example:

(1)     During his conversation with Dr. O'Halloran, Mr. Sain told the doctor that part of the reason the defendants were interested in retaining Dr. O'Halloran was because Mr. Sain understood from their prior work together that Dr. O'Halloran was not a fan of the "excited delirium" diagnosis in general, and that Mr. Sain suspected that he might be able to explain the death of the decedent in this matter more simply in terms of the drug toxicology issues of the case.   Declaration of Tony M. Sain, paragraph 3.

During their conversation Dr. O'Halloran indicated that his inclination would be to call the death one due to drug toxicity.  He and Mr. Sain discussed the general merits of explaining to a jury a more familiar cause of death – drug toxicity – than a cause of

death – excited delirium – less familiar to lay people.  Mr. Sain discussed with Dr. O'Halloran his personal views about the challenges presented by the need to explain to lay jurors the meaning and significance of the diagnosed cause of death – excited delirium – as compared to presenting an easier-to-understand cause of death – drug toxicity – which Mr. Sain believed the evidence also supported.  Declaration of Tony M. Sain, paragraph 7.

In his report, Dr. O'Halloran attacks – at length – both the diagnosis of excited delirium in this specific case and the theory in general.  See pages 9-10 and 12-13 of his report.  Notably, while Dr. O'Halloran does suggest an alternative cause for the decedent's death – restraint asphyxia – nowhere in the report is there any mention, much less a discussion, of the possibility that the decedent died from drug toxicity.

(2)    During his conversation with Dr. O'Halloran, Mr. Sain told the doctor that part of the reason the defendants were interested in retaining Dr. O'Halloran was because Mr. Sain suspected that Dr. O'Halloran would agree that TASERs could not have been a cause or contributor to the death of the decedent in this matter.  Declaration of Tony M. Sain, paragraph 3.  Mr. Sain also explained to Dr. O'Halloran defense counsel anticipated that plaintiffs' counsel would likely pursue a TASER-shocked-to-death theory or a compression asphyxia theory of the cause of the decedent's death.  Mr. Sain stated to Dr. O'Halloran that based on defense counsel's evaluation of the evidence, they believed that the evidence would not support the TASER theory, because the decedent had continued to vocalize and actively resist the officers for several minutes after the last TASER discharge.  Declaration of Tony M. Sain, paragraph 6.

Nowhere in Dr. O'Halloran's report is there any mention, much less a discussion, of the possibility that the decedent died as a result of a reaction to be tased multiple times, nor does the doctor opine that TASERs were a cause/contributor to death.

(3)    Mr. Sain discussed with Dr. O'Halloran his observations and analysis of the testimony given by Deputy Medical Examiner Glenn E. Holt, M.D. at his deposition,

-10-

and drew Dr. O'Halloran's attention to the fact that Dr. Holt had excluded TASER electricity, asphyxia, blunt force trauma, or restraint/action by the officers (as opposed to resistance to restraint by the decedent) as causes or contributing factors in the death of the decedent, and commented about the significance these findings would have in the defense of this action.  Declaration of Tony M. Sain, paragraph 5.

In his report (at page 7), Dr. O'Halloran offered his own synopsis of Dr. Holt's *deposition* testimony: yet neither draft of the doctor's report identifies Dr. Holt's deposition transcript as part of the materials or records that Dr. O'Halloran received from plaintiffs or reviewed in the case.  Notwithstanding this lack of the Holt deposition, Dr. O'Halloran includes as Conclusion 2 of his report (at page 12) his agreement with several of Dr. Holt's deposition opinions, but rejects (also at page 12) Dr. Holt's finding that the cause of the decedent's death was excited delirium.

(4)     During his conversation with Dr. O'Halloran, Mr. Sain explained that defense counsel anticipated that plaintiffs' counsel would likely pursue a TASER-shocked-to-death theory or a compression asphyxia theory.  Mr. Sain stated to Dr. O'Halloran that based on defense counsel's evaluation of the evidence, they believed that the evidence would not support the compression asphyxia theory because there was no witness testimony that supported the notion that the officers had their body weight on the decedent's upper torso.  Declaration of Tony M. Sain, paragraph 6.  Mr. Sain discussed with Dr. O'Halloran the significance Dr. Holt's finding that asphyxia was not a  cause or contributing factor in the death of the decedent would have in the defense of this action.  Declaration of Tony M. Sain, paragraph 5.

In his report, Dr. O'Halloran expressed his opinion that the decedent died from restraint/compression asphyxia and discussed that conclusion at great length.   See pages 8-12.

///

///

///

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

## 4.  DR. O'HALLORAN SHOULD BE DISQUALIFIED FROM ACTING AS AN EXPERT FOR THE PLAINTIFFS HERE

There are remarkable parallels between the present case and *Shadow Traffic.*  In both, a party met with an expert, discussed the case with that expert, but then decided not to retain the expert.  Then the opposing party hired that same expert for the same case, despite being aware of the prior consultation with the expert by their opponent. In both cases, the non-retaining party had a reasonable expectation that their discussion with the expert would be kept confidential, notwithstanding that the expert was not ultimately retained as an expert for the case.  In both cases, the expert was made privy to confidential information about the non-retaining party's counsel's theories and analysis of the case, regarding the identical topics and issues on which the expert ultimately rendered opinions favorable to the retaining party.    Under these circumstances, the same conclusion should be drawn:

> "Even assuming that [plaintiffs' counsel Gonzalez] did not expressly ask [O'Halloran] about the contents of his discussion with [defense counsel Sain] and that [O'Halloran] did not explicitly disclose the information to [Gonzalez], [Gonzalez] could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice [O'Halloran] rendered to [the plaintiffs].  Given that both [the defendant] and [the plaintiffs] consulted [O'Halloran] on the same issue[s] ... it is highly unlikely that [O'Halloran] could conscientiously discharge his duty to [the plaintiffs] as [their] retained expert and at the same time discharge his duty not to divulge confidential information received from [the defendant]."

*Shadow Traffic Network, supra,* 24 Cal.App.4th at 1086.

As discussed in Section 3 above, Dr. O'Halloran's report addresses a number of issues he discussed with defense counsel Tony Sain, including issues where Mr. Sain shared defense counsel's thoughts, analyses, trial strategies, and other attorney work product.  As in *Shadow Traffic,* it is unfeasible to believe that the information Dr. O'Halloran received from Mr. Sain did not "shape or affect the analysis and advice [O'Halloran] rendered to [the plaintiffs]," even if that effect was unconscious and unintentional.  Under these circumstances, disqualification of Dr. O'Halloran is the

-12-

only way to insure the " integrity of the adversary process". *Wang Laboratories, Inc., supra,* 762 F.Supp. at 1248 (E.D. Va. 1991) (emphasis added, citations omitted).

This result is consistent with the case law discussed in Section 2 above.

"First, was it objectively reasonable for the first party who claims to have retained the consultant ... to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the consultant? Affirmative answers to both inquiries compel disqualification."

*Ibid.*

**It is clear that a confidential relationship did exist between defense counsel and Dr. O'Halloran, and that confidential information was disclosed to Dr. O'Halloran in the course of that relationship.** Further, Mr. Sain made clear to Dr. O'Halloran that "retention and a confidential relationship [was] desired and intended", and Dr. O'Halloran was amenable to that, and he expressed no "doubts about [his] desire to be retained". *Id.* at 1248-1249.

*See also Kane, supra,* 2013 U.S. Dist. LEXIS 109900 at *17 ("Courts generally disqualify an expert based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation.") and *Ross, supra,* 2014 U.S. App. LEXIS 1827 at *17 ("First, the court asks whether the adversary had a confidential relationship with the expert. Second, the court asks whether the adversary disclosed confidential information to the expert that is relevant to the current litigation." [Citations omitted.])

Plaintiffs' counsel has argued that in order to justify disqualification of Dr. O'Halloran, the defendant additionally has the burden of proving prejudice. That isn't what the case law holds – *see, e.g., Wang Laboratories,* 762 F.Supp. at 1248, that where the two-step inquiry yields "[a]ffirmative answers to both inquiries", then disqualification is ***compelled.*** But in any case, ***there is evidence of prejudice here:*** the likelihood that Dr. O'Halloran's opinions as expressed in his report were shaped or affected by the confidential information he received from defense counsel Tony

-13-

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

Sain, and that otherwise protected attorney work product was shared with plaintiffs/ plaintiffs' counsel through Dr. O'Halloran.  In light of the foregoing, the standards for disqualification are met here, and Dr. O'Halloran therefore should be disqualified.

**5.      THE COURT SHOULD CONSIDER WHETHER PLAINTIFFS' COUNSEL JORGE GONZALEZ SHOULD ALSO BE DISQUALIFIED**

In *Shadow Traffic,* the issue before the Court was whether to disqualify counsel for the retaining party, because the tainted expert had already voluntarily withdrawn.

> "We realize the serious consequences of disqualifying attorneys and depriving clients of representation by their chosen counsel.  However, we must balance the important right to counsel of one's choice against the competing fundamental interest in preserving [confidential information].  All attorneys share certain basic obligations of professional conduct, obligations that are essential to the integrity and function of our legal system.   Attorneys must respect the confidentiality of attorney-client information and recognize that protecting confidentiality is an imperative to be obeyed in both form and substance.  To discharge this obligation and at the same time properly represent its client Shadow, if Latham & Watkins wished to employ Deloitte & Touche, it should have contacted Andrews & Kurth  upon learning of the latter's discussion(s) with Deloitte & Touche.  Latham & Watkins failed to take that simple step.  Had Andrews & Kurth objected to a retention by Latham & Watkins of Deloitte & Touche, Latham & Watkins, if it believed the objection unfounded, could have fashioned an application to the trial court indicating its desire and the necessity for the services of Deloitte & Touche. ...  Instead, Latham & Watkins hired Deloitte & Touche and presumably gained the advantage of learning confidential information disclosed by its adversary.  Given its implied findings on these points, the trial court did not abuse its discretion in  prohibiting  Latham  &  Watkins  from  further  participating  in  the litigation."

*Shadow Traffic Network, supra,* 24 Cal.App.4th at1087-1088; citation and internal quotation marks omitted.

The situation here is almost identical.  Once plaintiffs' counsel Jorge Gonzalez learned that the expert the plaintiffs were interested in retaining had already been approached by defense counel in this same case, he should have taken the "simple step" of asking if the defendant had any objection to the plaintiffs retaining Dr. O'Halloran.  If the defendant had objected, and plaintiffs' counsel thought that that

-14-

1  objection was inappropriate, the plaintiffs could have sought relief from this Court.

2  Instead, Mr. Gonzalez simply went ahead and retained Dr. O'Halloran – ***even after***

3  ***being advised by the doctor of the prior pre-retention call*** – thereby gaining, at least

4  indirectly, the benefit of his confidential conversation with defense counsel Tony

5  Sain.   That was sufficient for the California Court of Appeal to uphold the order

6  disqualifying Shadow's counsel from further participation in the action, and so this

7  Court should consider taking the same action as was taken in *Shadow Traffic.*

8

9                                    **CONCLUSION**

10         Given the facts and the applicable case law, this Court should disqualify Ronald

11  L. O'Halloran, M.D. from continuing to act as an expert for the plaintiffs in this

12  action, and should further order that plaintiffs are to make no use of any information or

13  materials provided to them by Dr. O'Halloran and should destroy any such materials in

14  their possession or that of their attorneys.

15         Further, this Court should consider whether the circumstances require that

16  plaintiffs' counsel Jorge Gonzalez also be disqualified, for the same reasons.  (On May

17  19, 2014, plaintiffs' counsel Francisco A. Suarez filed a motion to withdraw as counsel

18  in this action.  The defendant would suggest that Mr. Suarez's motion to withdraw not

19  be considered by this Court until the issue, discussed above, of whether plaintiffs'

20  counsel Jorge Gonzalez should be disqualified from further representing the plaintiffs

21  in this matter has been resolved.)

22  Dated:  May 20, 2014                    Respectfully submitted,

23                                          **MANNING & KASS**
                                            **ELLROD, RAMIREZ, TRESTER** LLP
24

25                                     By:  ***/s/ Tony M. Sain***
                                            ──────────────────────────
26                                          MILDRED K. O'LINN
                                            TONY M. SAIN
27                                          STEVEN J. RENICK

28                                          Attorneys for Defendant
                                            CITY OF COLTON

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

# DECLARATION OF TONY M. SAIN

I, TONY M. SAIN, declare that:

1.     I am an attorney at law duly licensed to practice before all of the courts of the State of California and this court.  I am an attorney with the law office of Manning & Kass, Ellrod, Ramirez, Trester LLP, the attorneys for defendant CITY OF COLTON In this action.  If called upon to do so, I could and would competently testify to the following from my personal knowledge.

2.     As part of my responsibilities as one of the attorneys represented defendant City of Colton in this matter, I was tasked with locating and retaining expert witnesses to support the defense of this action.  Accordingly, on December 11, 2013, I emailed Ronald L. O'Halloran, M.D., a medical examiner/expert I had retained on a prior case (*K. Munoz v. County of San Bernardino*), explaining that I "[w]anted to run something by [him] on a new case: not ready to retain anyone yet, but wanted your knee-jerk reaction." Dr. O'Halloran's responses was "[y]ou can just give me a call and we can talk about your new case.  No problem." Over the next few days Dr. O'Halloran and I exchanged several emails as we attempted to schedule an initial teleconference on the Serrano case.  Copies of these various emails are attached as Exhibit A to this declaration.

3.     On December 17, 2013, at just after 10:00 a.m., I telephoned Dr. O'Halloran and we spoke for more than a half-hour about the Serrano case.  During our conversation, I identified the parties involved in the case and asked Dr. O'Halloran if anyone else had contacted him about the case.  He responded that no one else had contacted him.  I then told Dr. O'Halloran that my firm was considering seeking authorization from our client, the City of Colton, to retain him as an expert in the Serrano case.  I explained that we wanted to do this because: (a) his work on our prior case together (*Munoz*) had been very good; (b) I understood from our work on the prior case that he was not a fan of the "excited delirium" diagnosis in general, and I

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

1   told him that I suspected he might be able to explain Serrano's death more simply in
2   terms of the drug toxicology issues of the case; and (c) I understood from our prior
3   conversations that he was not a fan of TASERs but that I believed that his skepticism of
4   TASERs would be useful in this case because I suspected he would agree that TASERs
5   could not have been a cause or contributor to Serrano's death.

6       4.      I explained to Dr. O'Halloran that even though our client had not yet
7   authorized us to retain him in the Serrano matter, I was hoping he would provide me
8   with his "knee-jerk" impressions about the case, which would enable me to formulate
9   a formal recommendation to our client about retaining Dr. O'Halloran.  Dr. O'Halloran
10  agreed to provide me with his preliminary impressions about the case at no charge.

11      5.      I then disclosed to Dr. O'Halloran the decedent's toxicology results, the
12  coroner's conclusions as to the cause of death, and summarized the deposition testimony
13  of the coroner (Deputy Medical Examiner Glenn E. Holt, M.D.) that I had just taken on
14  December 5, 2013.  At the time of my conversation with Dr. O'Halloran the transcript
15  of that deposition had not yet been delivered to my firm, so my comments to Dr.
16  O'Halloran were based on my memory of the testimony given by Dr. Holt at that depo-
17  sition, and included my observations and analysis of that testimony.  I particularly drew
18  Dr. O'Halloran's attention to the fact that the coroner had excluded TASER electricity,
19  asphyxia, blunt force trauma, or restraint/action by the officers (as opposed to resistance
20  to restraint by Serrano) as causes or contributing factors in Serrano's death and com-
21  mented about the significance these findings would have in our defense of this action.

22      6.      During my conversation with Dr. O'Halloran I also explained to him that
23  it was currently unclear to us what theory of the cause of the decedent's death the
24  plaintiffs would pursue at trial, but that we anticipated that plaintiffs' counsel would
25  likely pursue a TASER-shocked-to-death theory or a compression asphyxia theory.  I
26  stated to Dr. O'Halloran that based on our (i.e. defense counsel's) evaluation of the
27  evidence, we believed that the evidence would not support either potential theory,
28  because the decedent had continued to vocalize and actively resist the officers for

-17-

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

several minutes after the last TASER discharge, and because there was no witness testimony that supported the notion that the officers had their body weight on the decedent's upper torso. I advised Dr. O'Halloran that the attorney for the plaintiffs in the *Serrano* case – Jorge Gonzalez – had also been the plaintiff's counsel in the *Munoz* case. I discussed Mr. Gonzalez's litigation style with Dr. O'Halloran, comparing it to how he had handled the *Munoz* litigation.

7.      After providing these facts and our (defense counsel's) impressions and analysis regarding those facts, I asked Dr. O'Halloran for his "knee-jerk" – i.e. preliminary – impressions about the case. Dr. O'Halloran responded that his inclination would be to call the death one due to drug toxicity. We then discussed the general merits of explaining to a jury a more familiar cause of death – drug toxicity – than a cause of death – excited delirium – less familiar to lay people. I discussed with Dr. O'Halloran my personal views about the challenges presented by the need to explain to lay jurors the meaning and significance of the diagnosed cause of death – excited delirium – as compared to presenting an easier-to-understand cause of death – drug toxicity – which we believed the evidence also supported.

8.      I then asked Dr. O'Halloran if he would be willing to help out our client as an expert in either the initial expert disclosures phase or the rebuttal phase of the case, and/or possibly with a declaration supporting the motion for summary judgment we anticipated filing in this action. Dr. O'Halloran responded that would be willing to do any of that. I then explained to Dr. O'Halloran that my plan was to consult with lead defense attorney Mildred O'Linn and with our client about retaining him for the Serrano matter and that I planned to recommend that he be retained as a defense expert witness in this matter. I also advised Dr. O'Halloran of the trial dates/schedule and asked him to try to keep his calendar clear. I stated that if he had to take other projects with calendar conflicts before we had formally retained him that would be fine; to simply let us know. I asked Dr. O'Halloran to keep our conversation confidential and he agreed. The call ended well.

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

9.      In accordance with my standard business practice, routine, and the directives of the lead attorney on this case, within a few minutes of ending the call, I immediately began drafting an internal email summarizing the details of my call with Dr. O'Halloran. The email summary took me about 15 minutes to complete and send to the members of the defense team for this case. Attached as Exhibit B to this declaration is a copy of that email.

10.     Dr. O'Halloran's phone number is (805) 647-5198 (as can be seen on the first page of the report he submitted in this matter, a copy of which is attached as Exhibit D). Our firm uses a computer program called ShoreTel Communicator to manage individual attorneys' phones. The program automatically maintains a history of the phone calls made by the attorney. Attached as Exhibit C is a copy of a screen shot of that program, showing that on December 17, 2013, I had a 36 minute phone call to (805) 647-5198.

11.     Ultimately it was decided not to retain Dr. O'Halloran to act as an expert witness for the defendant in this matter in the initial expert disclosures phase. However, I was considering retaining him as a rebuttal expert, depending on what plaintiffs did with their expert disclosures.

12.     I was shocked to thereafter see Dr. O'Halloran designated by the plaintiffs as one of their expert witnesses in this case. I learned of this on May 2, 2014, after 3:30 p.m., when I first saw plaintiffs' expert disclosures in this case. Attached as Exhibit D is a copy of the expert report prepared in this matter by Dr. O'Halloran in his role as a designated expert witness for the plaintiff. This report was provided to defense counsel by plaintiffs' counsel.

13.     Neither I nor any other attorney in my firm had received any prior communication from either Dr. O'Halloran or any of plaintiffs' attorneys that the plaintiffs were contemplating retaining Dr. O'Halloran. If we had been contacted, we would have objected to the plaintiffs retaining Dr. O'Halloran in light of the confidential information about the case that had been given to Dr. O'Halloran, which included the

-19-

thoughts and impression of defense counsel about the evidence and the potential defense trial strategies for this matter.

14.     Once we learned of the designation of Dr. O'Halloran, we quickly contacted plaintiffs' counsel and asked them to withdraw Dr. O'Halloran.   Specifically, on the afternoon of May 5, 2014, defense counsel Mildred O'Linn and I spoke by telephone with plaintiffs' counsel Jorge Gonzalez.  We informed Mr. Gonzalez that I had consulted with Dr. O'Halloran about this case in December 2013, preliminary to potentially retaining him as an expert witness in this matter on behalf of the defendant.   We reminded Mr. Gonzalez that Dr. O'Halloran had previously been used by our office as an expert witness in the *K. Munoz v. County of San Bernardino* case, in which Mr. Gonzalez had also acted as the plaintiff's attorney.  We explained to Mr. Gonzalez that I had a substantive attorney work product communication with Dr. O'Halloran about the *Serrano* matter, including review of testimony, attorney opinions and tactical discussions/plans, and other confidential information.  Mr. Gonzalez responded by telling us that Dr. O'Halloran had informed Mr. Gonzalez that while he had previously spoken to our office about this case, that discussion was not very extensive and/or not substantive.  Defense counsel advised Mr. Gonzalez that this was not the case and offered to stipulate to a joint request for an extension of the time to disclose and conduct discovery re experts in order to permit plaintiffs to replace Dr. O'Halloran.

15.     The next day, May 6, 2014, with the assistance of Steve Renick, Esq., my office sent a lengthy letter to plaintiffs' counsel which reviewed the confidential information that had been provided to Dr. O'Halloran and discussed the case law relevant to situations such as this. The letter concluded by again asking plaintiffs' counsel to withdraw Dr. O'Halloran, and explaining that if they did not do so voluntarily, we would be forced to file a motion requesting Dr. O'Halloran's disqualification, and that we might feel it necessary to also ask for the disqualification of plaintiffs' attorneys in light of the information they had received from Dr. O'Halloran. A copy of that letter is attached as Exhibit E.

-20-

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

16.     Plaintiffs' counsel Jorge Gonzalez responded the next day (May 7, 2014) by letter advising us that the plaintiffs would not be withdrawing Dr. O'Halloran as an expert witness in this case.  A copy of that letter is attached as Exhibit F.

17.     We were unable to immediately begin work on a motion to disqualify Dr. O'Halloran because we were completing the motion for summary judgment in this matter, which was filed on May 12, 2014.  Additionally, under the Local Rules, a meet-and-confer session was required at least 10 days prior to filing a noticed motion: which meant that the earliest we could file a noticed motion on the matter would have been May 12, 2014 – which would have been insufficient time to receive relief before the operative May 30, 2014 expert discovery cut-off.

18.     On Friday, May 16, 2104, with the assistance of Steve Renick, Esq., my office sent a letter to plaintiffs' counsel advising them that we planned on filing an ex parte application relating to the issue of the designation of Dr. O'Halloran on the following Monday, May 19, 2014.  The letter explained that we would be presenting three alternatives for the Court's consideration: to immediately address the merits of this dispute, to shorten time for the hearing of a motion on the merits (to be heard prior to the discovery cut-off date), or to set our ex parte application for hearing on normal notice for a motion and to extend the deadline for the defendant to depose the plaintiffs' expert witnesses to a date after the court rules on the ex parte application.  The letter asked plaintiffs' counsel to advise us by May 19, 2014 if there was any portion of our proposed ex parte application that the plaintiffs would agree not to oppose, or whether the plaintiffs would be opposing the application in its entirety.  The letter explained that we would include the plaintiffs' position on this point in our application.   A copy of that letter is attached as Exhibit G.

19.     On May 19, 2014, plaintiffs' counsel Jorge Gonzalez responded to our May 16th letter with his own letter in which he advised us that the plaintiffs would be opposing our ex parte application.  He also accused us of not providing the plaintiffs with reasonable notice of the ex parte application.  A copy of that letter is attached as

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

Exhibit H.  Mr. Gonzalez's comment about not providing the plaintiffs with reasonable notice of the ex parte application was completely unjustified, because by informing plaintiffs' in advance of the defendant's intention to file this ex parte application, the defendant was providing the plaintiffs with ***more*** notice of that application than is required under this Court's rules.

20.    It had been our intention to file this ex parte application on Monday, May 19, 2014.  Unfortunately, we had a serious problem with our computer system on May 19th which prevented us from finalizing the application and arranging for its filing and service.  Accordingly, this application is being filed today – Tuesday, May 20, 2014.

21.    Ex parte consideration of the issues raised by this application is necessary because of the expert discovery cut-off date of May 30, 2014.  By the time I became aware on or about May 2, 2014 that the plaintiff had designated Dr. O'Halloran as an expert witness, it was already 28 days prior to that cut-off date, thereby making it impossible to have a regularly scheduled motion seeking to disqualify Dr. O'Halloran heard prior to the cut-off date while still complying with the Local Rules regarding the time for conference of counsel.  [*See* U.S. Dist. Ct., C.D. Cal. L.R. 7-3 (meet-and-confer due 7 days before motion filing).]  One of the alternative options for relief suggested by the defendant in this application is to extend that cut-off date so that this application can be heard as a noticed motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 20, 2014 at Los Angeles, California.

/s/  **Tony M. Sain**
TONY M. SAIN

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

# DECLARATION OF STEVEN J. RENICK

I, STEVEN J. RENICK, declare that:

1.      I am an attorney at law duly licensed to practice before all of the courts of the State of California and this court.  I am an attorney with the law office of Manning & Kass, Ellrod, Ramirez, Trester LLP, the attorneys for defendant CITY OF COLTON In this action.  If called upon to do so, I could and would competently testify to the following from my personal knowledge.

2.      On the afternoon of May 20, 2014, prior to the filing of this ex parte application, I telephoned plaintiffs' counsel Jorge Gonzalez at approximately 2:30 pm. I spoke with Mr. Gonzalez and informed him that we were about to file this ex parte application and that I would be emailing a copy of it directly to his email address (noted on page ii above).  At approximately 2:40 pm I telephone plaintiffs' counsel Francisco A. Suarez.  I spoke with Mr. Suarez and informed him that we were about to file this ex parte application and that I would be emailing a copy of it directly to his email address (noted on page ii above).

3.      I will be emailing a copy of this ex parte application, and the accompanying proposed order, to Mr. Gonzalez and Mr. Suarez in the next few minutes, immediately prior to electronically filing this application with the Court.  The email to Mr. Gonzalez and Mr. Suarez will advise them that, pursuant to this Court's rules, any opposition must be filed no later than 24 hours after service of such email.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 20, 2014 at Los Angeles, California.

*/s/  Steven J. Renick*
STEVEN J. RENICK

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd

**EX PARTE APPLICATION:  1) TO DISQUALIFY PLAINTIFFS' EXPERT (etc.)**

E X H I B I T   A

**Tony Sain - Re: Serrano (RO) Prelim Query**

| | |
|---|---|
| **From:** | "Ronald O'Halloran" <vcmedexaminer@yahoo.com> |
| **To:** | Tony Sain <tms@manningllp.com> |
| **Date:** | 12/14/2013 8:44 AM |
| **Subject:** | Re: Serrano (RO) Prelim Query |

Sounds good.
Ron

---

**From:** Tony Sain <tms@manningllp.com>
**To:** vcmedexaminer@yahoo.com
**Sent:** Saturday, December 14, 2013 5:58 AM
**Subject:** Re: Serrano (RO) Prelim Query

No worries. I tried to call but got a busy signal. How about t 12/17 at 10a?

-Tony M. Sain

Please treat as Confidential. Thanks.

On Dec 13, 2013, at 9:05 PM, "Ronald O'Halloran" <vcmedexaminer@yahoo.com> wrote:

> It would have, if I got your email before 9 pm. I only check my email once or twice
> a day. Call me a rebel against staying connected 24/7. Call me old fashioned. Or,
> just give me a call.
>
> Ron
>
> ---
>
> **From:** Tony Sain <tms@manningllp.com>
> **To:** Ronald O'Halloran <vcmedexaminer@yahoo.com>
> **Sent:** Friday, December 13, 2013 8:42 AM
> **Subject:** Re: Serrano (RO) Prelim Query
>
> Would 12n today (12/13) work?
>
> Tony M. Sain, Esq.
> MANNING & KASS,
> ELLROD, RAMIREZ, TRESTER, LLP
> 801 South Figueroa Street,
> 15th Floor at 801 Tower
> Los Angeles, CA 90017
> 213.624.6900 x2283
> 213.624.6999 (fax)
> tms@manningllp.com
>
> (Please note that my email address has changed.)
> *************************************************

**000025**

* CONFIDENTIALITY NOTICE *
*******************************************
This message and its attachments are sent by a lawyer and may contain information that is confidential and protected by privilege from disclosure; as such, this message is intended only for the confidential use of the intended recipient(s). If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving this message or its attachments. In such an event, please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately. Thank you.


>>> "Ronald O'Halloran" <vcmedexaminer@yahoo.com> 12/11/2013 4:59 PM >>>
Hi Tony,

Well, yes and no about payment.  Yes, I got paid for the August bill (the big bill), but no payment for September bill yet.  The first payment came about

You can just give me a call and we can talk about your new case.  No problem.

I'm usually around home.

805-647-5198

Ron

---

**From:** Tony Sain <tms@manningllp.com>
**To:** Ron O'Halloran <vcmedexaminer@yahoo.com>
**Sent:** Wednesday, December 11, 2013 4:12 PM
**Subject:** Serrano (RO) Prelim Query

Hey Doc!

You get paid for Munoz yet?  Wanted to run something by you on a new case: not ready to retain anyone yet, but wanted your knee-jerk reaction.  Thanks!


Tony M. Sain, Esq.
MANNING & KASS,
ELLROD, RAMIREZ, TRESTER, LLP
801 South Figueroa Street,
15th Floor at 801 Tower
Los Angeles, CA 90017
213.624.6900 x2283
213.624.6999 (fax)
tms@manningllp.com

(Please note that my email address has changed.)
*******************************************
* CONFIDENTIALITY NOTICE *
*******************************************
This message and its attachments are sent by a lawyer and may contain information that is

confidential and protected by privilege from disclosure; as such, this message is intended only for the confidential use of the intended recipient(s). If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving this message or its attachments. In such an event, please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately. Thank you.

000027

EXHIBIT B

## Tony Sain - Serrano - T/C Dr. Ron O'Halloran - non-retained preliminary consult

| | |
|---|---|
| **From:** | Tony Sain |
| **To:** | Serrano 1 - MKERT |
| **Date:** | 12/17/2013 11:10 AM |
| **Subject:** | Serrano - T/C Dr. Ron O'Halloran - non-retained preliminary consult |

I had a conversation with Dr. O'Halloran (M.E. from K. Munoz case): he agreed to provide his knee-jerk impression without being retained and agreed to keep our conversation confidential. After being told who the plaintiffs, decedent, and defendant City was, he advised that no one else had contacted him about this case.

I orally reviewed the facts with him from plaintiffs' witnesses, and the ME's depo. We discussed the disputed role of "excited delirium" as a cause of death in the ME community. At first impression (without review of any documents), O'Halloran would've called the cause of death a cardiac arrest resulting from meth toxicity and resistance to restraint with obesity and cardiomegaly as contributors. He finds it interesting that there's no testimony to body weight being put on Serrano's back and that ME ruled out asphyxia.

If case does not resolve, O'Halloran would be willing to help us on a declaration for MSJ to try to eliminate officer action as a legal cause of decedent's (and thereby plaintiffs') injuries. I advised him that if case does not resolve in January, we expect to approach the client about retaining him, possibly circa March.

Thx.


Tony M. Sain, Esq.
MANNING & KASS,
ELLROD, RAMIREZ, TRESTER, LLP
801 South Figueroa Street,
15th Floor at 801 Tower
Los Angeles, CA 90017
213.624.6900 x2283
213.624.6999 (fax)
tms@manningllp.com

(Please note that my email address has changed.)
**********************************************
* CONFIDENTIALITY NOTICE *
**********************************************
This message and its attachments are sent by a lawyer and may contain information that is confidential and protected by privilege from disclosure; as such, this message is intended only for the confidential use of the intended recipient(s). If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving this message or its attachments. In such an event, please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately. Thank you.

E X H I B I T   C



E X H I B I T   D

**Ronald L. O'Halloran, M.D.**
347 Nevada Avenue
Ventura, California 93004
Phone 805-647-5198
Email vcmedexaminer@yahoo.com

May 1, 2014

Jorge Gonzalez, Esquire
2485 Huntington Drive, Suite 238
San Marino, CA 91108

RE:    Hutalio Serrano v. City of Colton
        EDCV 13-519 JAK (JEMx)

<u>**REPORT OF DR. RONALD O'HALLORAN**</u>

*This report is prepared and submitted pursuant to Federal Rule of Civil Procedure 26.*

Dear Counsel:

As initially requested on April 18, 2014, I have reviewed the record materials you delivered to me by email subsequently in late April and early May concerning the January 15, 2012 officer-involved restraint and death incident regarding Hutalio Serrano. This report summarizes my conclusions regarding the forensic pathology cause-of-death issues involving Mr. Serrano and the restraint incident.

<u>**Summary of Forensic Pathology Qualifications**</u>

My conclusions are based on my knowledge, training, and experience coupled with a critical examination of the record materials I received.

I am a physician, certified by the American Board of Pathology in the medical specialty of anatomic pathology and the subspecialty of forensic pathology. I have worked full time as a forensic pathologist and medical examiner for 33 years, retiring as the Chief Medical Examiner of Ventura County in California on July 1, 2012. Since my retirement from Ventura County I have continued to do autopsies and to consult as a forensic pathologist. I have conducted more than 8,000 forensic autopsies personally. I have been interested in the subject of death associated with custody restraint for more than twenty years; have researched the topic; conducted autopsies in such cases; consulted; lectured; and published scientific papers on the subject

Attached are my curriculum vitae, fee schedule and recent testimony list.

<u>**Materials Reviewed**</u>

1

000033

Prior to preparing this report I reviewed the following records and informational material related to this officer-involved use-of-force restraint case:

- Autopsy report
- Toxicology report
- Two taser generated audio-video clips
- SBSO written witness interview report of Efrain Hernandez Sr. (Gabriella's father), Efrain Hernandez Jr. (Gabriella's brother), and Gabriella Serrano (wife of decedent), dated 1/19/12
- Family notification and interview of Gabriella Serrano and Efrain Hernandez Jr. at hospital, dated 1/15/12
- SBSO written witness interview report of Janet and Mario Bruton (neighbors), dated 1/15/12
- SBSO written witness interview report of Teresa Hernandez (Gabriella's mother), dated 1/19/12
- SBSO written witness interview report of Biviana Serrano (decedent's teenage daughter), dated 1/19/12
- SBSO written Officer-involved interview statement of Colton PD Sgt. Robbie Bornsheur, dated 1/16/12
- SBSO written Officer-involved interview statement of Colton PD Officer Wade Harris, dated 1/16/12
- SBSO written Officer-involved interview statement of Colton PD Officer Saul Salazar, dated 1/16/12
- Investigative Report by Reynoso Investigation Services dated 4/23/12 (interviews of Gabriella and Efrain Hernandez Sr. on 3/1/12)
- Loma Linda Univ. Med. Center Emergency Dept. records from terminal visit
- EMS records from Colton FD and AMR from 911 code response
- San Bernardino County DA Officer Involved Death Investigation Report (items of potential value not included in the electronic copy but stated in Preamble to be part of report are: dispatch call log and audio; photographs; video recordings and audio recordings)
- SBSO Taser reports from Officers Salazar and Harris' units

I understand from an earlier conversation with you that recent discovery information including officer involved deposition material from the last few days and possibly more discovery in formation in days to come may be available to me.  This report, with a court mandated 5/2/14 completion deadline, is written with that in mind.

I reserve the right to obtain additional discovery items or records that may assist in my further evaluation of this matter. Additionally, I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that becomes available to me, at which time a supplemental report may be submitted. I will also make myself available for deposition by defendants prior to the operative discovery cut-off at a mutually agreeable date and time, upon reasonable request.

## Summary of the Incident and Circumstances of Death
*Note:   I have provided this summary for convenience: it does not necessarily itemize every single fact replied upon by this expert in the formation of my conclusions in this*

2

*matter, and it is based on my review of the aforementioned records-materials. I do not contend to have direct personal knowledge of the incident facts.*

**What happened according to police statements:**

According to the District Attorney report the three officers involved measured and weighed (presumed without gear):
Salazar – 5'8" and 185 pounds
Harris – 5'11" and 205 pounds
Bornsheur – 5'10" and 205 pounds

Mr. Serrano (Serrano) was 43 years old at the time of his restraint and death on 01/15/12. He was initially detained by Colton Police Officer Salazar (Salazar). Later, Officer Harris (Harris) arrived and assisted in the restraint, followed finally by Sgt. Bornsheur (Bornsheur). Police reported that Serrano was uncooperative in response to verbal commands, sweating, pacing and seemed to be under the influence of some drug. The incident was partially captured on the video/audio chips in Salazar's and Harris' Taser units. Activities were also witnessed to varying degrees by nearby neighbors and relatives of Serrano including his wife, his children and his in-laws.

Mr. Serrano did not respond completely or promptly to Salazar's commands to get down on the ground. Serrano did respond to a command to get on his knees but kept moving around. Serrano repeatedly pled in Spanish interspersed with "por favor". Salazar held his flashlight in one hand and his Taser in his other hand. He struck Serrano in the arm with his flashlight when Serrano moved a hand toward the front of his body.

Officer Harris arrived. Both officers fired their Tasers and discharged them several times. The Taser wire probes embedded in Serrano's clothing and skin as evidenced by his reactions to delivered shocks seen on the videos and later by wounds observed at his autopsy. He rolled around on the ground, pleading while officers gave commands. Harris admitted to using knee strikes and facial punches during the restraining process.

Sgt. Bornsheur arrived last at the struggle to see Harris fighting with Serrano on the ground and Harris standing beside them holding his Taser. Bornsheur stood on Serrano's left arm as the Taser videos ended.

All three officers were able to keep Serrano on the ground using their strength and body weight. They first got Serrano's right wrist handcuffed. Serrano was rolled onto his stomach with his left hand trapped underneath him. Harris and Bornsheur used punches to try and aid getting the left hand free and the second cuff attached. When they got his hand out they cuffed it using a second pair of handcuffs on the left wrist.

Serrano was prone and officers linked the two sets of handcuffs together behind his back. Bornsheur reported making a radio call to dispatch at this time for more officers to assist and to bring a hobble.

Officers reported that Serrano was strong and the struggle to keep him down was intense, requiring weight force to keep him down prone. Witnesses reported they saw all three officers on top of Serrano holding him down. Salazar reported he was exhausted and out of breath and he sat on Serrano's legs. Bornsheur reported he held Serrano down prone using his weight on Serrano's right shoulder area. Bornsheur said Harris

3

000035

was holding Serrano down on the left side.  Bornsheur reported all officers were worn out and wondered when some backup officer would get there.  Bornsheur reported Serrano was "grunting, groaning, making noise, he's screaming, he is still going at it".  This was after Serrano was handcuffed and being held prone by the weight of the officers.  Bornsheur said he could hear "his guys" coming code but he need them to get here because he needed that hobble.

Salazar was telling Serrano to calm down.  Finally, Bornsheur said he noticed Serrano was not resisting any more.  Bornsheur said, "Okay, it looks like he is out right now."  Bornsheur didn't see Serrano making any movement so the three officers got off him and rolled him over, then they checked for breathing and a pulse.

Salazar took out smelling salts and put it under Serrano's nose but got no response.  Bornsheur then called dispatch and told them to send an ambulance.  Bornsheur reported that he knew Serrano was in trouble when he saw that Serrano's eyes were open but they didn't move and he had slobber on his mouth.  Bornsheur then ran back to his patrol car, got a CPR breathing mask and ran back.  He checked Serrano for a pulse and open airway one more time but still saw no signs of breathing or a pulse.

Serrano was placed on his back (still handcuffed behind his back).  Bornsheur used the breathing mask to provide artificial breathing and the two other officers alternated doing chest compressions.  Harris reported that he heard ribs break when he did CPR chest compressions.  The three officers continued rescue efforts until paramedics arrived and took over.

### What happened according to family and neighborhood witnesses' statements (collected by SBSO):

Approximately 11 lay witnesses were interviewed.  They varied in what they saw, how much of the restraint incident they saw and how far away they were while watching.  Generally, many saw and heard the struggle before the handcuffing, including shouted commands by police, pleas by Serrano, taser discharge sounds.  They saw punches, kicks, and object strikes by officers.  They saw officers on top of Serrano and saw officers doing CPR and Serrano appearing dead.  No one had seen physically aggressive behavior earlier that day or toward the police.

Serrano's wife (Gabriella) gave some background for the events that night.  She had temporarily moved away from her home with her husband and was staying at her parent's home a few miles away for a couple days.  She had taken their three children with her.  She was concerned by her husband's recent addictions and altered behavior as if he was mentally ill.  About six months prior he had started having agitated, erratic behavior that she thought could be from drugs but she didn't know what kind.  That day he came to her parent's door acting disoriented, paranoid, and hallucinating.  He paced and at times his speech was unintelligible.  She told him to leave.  He was seen wandering around the neighborhood, in and out of traffic.  She said her husband was not a violent or aggressive man.  She believed that her husband was confused the day of his death, that he didn't understand the police orders and was afraid.  She told coroner staff that she believed her husband was paranoid and had not slept for several days because he thought someone was going to kill him.

4

000036

**Prior police contacts:**
According to the DA report, Serrano's daughter called police because he was continually ringing the doorbell and knocking on the door of her grandparent's home.  Gabriella wanted him removed and police took him home and he ran away.

Eight months prior Serrano called police for a ride.  He had manifest behaviors similar to the day of death.  He was sweating, couldn't sit still, and couldn't follow instructions.  He was handcuffed for safety and brought to Arrowhead Medical Center.  He had a pulse of 140 bpm and said he took pills that a witch gave him.  He was put on a 72-hour hold, sedated and put in soft restraints at the hospital.

## EMS and Hospital Emergency Department Records

*Fire Rescue:*

Colton FD Rescue unit ME 214 record indicates the initial call was at 1737, arrival at scene @ 1742, and at the patient @ 1743.  When they arrived Serrano was unconscious with no pulse and no breathing.  Police were doing CPR and indicated the patient was pulseless following an altercation and tazing.  A heart monitor indicated cardiac asystole.  AMR ambulance 311 arrived and assisted care.

*Ambulance:*

AMR 311 ambulance records indicate a dispatch time of 1738 hours.  They arrived at the scene at 1744 and made patient contact at 1745.  Colton PD was doing CPR and the patient was on his back with his wrists cuffed behind him.  AMR had the cuffs removed.

ME-214 (Colton FD) was the initial EMS on scene and found patient apneic, pulseless and asystolic on EKG monitor.  AMR assisted.  Serrano was not breathing; he was neurologically unresponsive, pulseless with no pupil response to light. His skin was ashen, warm and moist.  Cardiac monitor indicated asystole.  They established an intraosseous line in the tibia and administered epinephrine twice, Narcan and glucose without effect.  He was ventilated with 100% oxygen by bag valve mask and chest compressions continued at the scene.  AMR ambulance transported Serrano to the hospital emergency department with continued CPR.  He was intubated per esophagus with a King tube with good breath sounds.  Continuous heart monitoring indicated continuing asystole with only a brief episode of bradycardic PEA (slow pulseless electrical activity) that returned to asystole.  Vital signs never returned in transit.  They arrived at hospital ED at 1800 hours and transferred care to the emergency department.

The event history from PD per the AMR records was that the irate subject was yelling at a female. He started fighting with PD and was tazed.  He started fighting with officers again, ran, and was tazed again, no more than 3 times.  After being handcuffed, Colton PD noticed he was not breathing.  They started CPR.

*Hospital Emergency Department:*

Vital signs could not be restored at Loma Linda University Medical Center Emergency Department where ALS meds were given again with continued resuscitative efforts.

5

000037

Record included attached cardiac rhythm strips of the asystole and slow PEA.  Serrano was pronounced dead about twenty minutes after admission @ 1823.

### Timeline summary rounded to nearest minute on 01/15/12:

| | |
|---|---|
| 1705 | 911 call for help from Serrano family (per coroner report) |
| **1719** | **Colton PD Officer Salazar arrived at scene (coroner)** |
| 1732:21 | First taser activation (per DA report) |
| **1733:02** | **Last taser activation started (per DA Taser analysis)** |
| ?? | Bornsheur radios dispatch to send officers to assist and bring hobble. (dispatch record?)<br>- Serrano is now prone and cuffed, compression continues |
| **1737** | **Officers call dispatch for ambulance; started CPR (coroner; per Colton FD)** |
| 1737 | Colton FD dispatched (Colton FD record) |
| 1738 | AMR reported dispatch time (AMR report) |
| 1742 | Colton FD rescue paramedics at scene (Colton FD record) |
| 1744 | AMR Paramedics arrive at scene (AMR report) |
| 1745 | AMR paramedics make patient contact, no vital signs (AMR report) |
| 1757 | Ambulance departs scene (EMS reports) |
| 1800 | Ambulance at hospital (coroner) |
| 1823 | Serrano pronounced dead in hospital ER (coroner) |
| 1846 | Rectal temperature taken at hospital, recorded as 102.2°F (coroner report) |

### Autopsy, Toxicology and Sheriff/Coroner COD Ruling

Autopsy:
Dr. Glenn Holt did an autopsy on 01/18/12, three days after death.  Mr. Serrano's body appeared consistent with age 43, measured 5'8" and weighed 290 pounds.  Multiple blunt force injuries were identified on the face, trunk, back, legs and arms.  Two lesions were found on his upper back and two on his right lower back and flank, consistent with taser dart wounds. Two darts were stuck in his sweatshirt.  He was obese.  The liver was heavy, weighing 2735 grams, consistent with mild fatty change from obesity and/or slight hypertension.  His heart was slightly heavy at 460 grams, consistent with obesity.  The coronary arteries were clear.  Microscopic examination of the heart revealed slight myocyte nuclear enlargement and slight interstitial fibrosis, also consistent with slight hypertension or just obesity.

Toxicology:
Femoral blood: 2.7 mg/L methamphetamine
              0.13 mg/L amphetamine

Dr. Holt's Diagnoses:

6

000038

1. Excited delirium (based on reported behavior prior to death; methamphetamine in blood; elevated rectal temperature)
2. Restraint by law enforcement history (with lesions consistent with CED; multiple blunt force injuries)
3. Mild cardiomegaly
4. Severe obesity with hepatic steatosis
5. Pulmonary congestion and edema
6. Old partial amputation of left ring finger
7. Resuscitation with fractures of ribs and sternum

Death Certificate:
Cause of death – Excited delirium in presence of police restraint
Contributing causes – mild cardiomegaly; obesity
Manner of death – Accident

**Dr. Holt's Deposition on 12/5/13:**

Asked about risk factors for sudden (cardiac) death in Serrano, he said:
Obesity and a mildly enlarged heart increase risk
Methamphetamine increases risk
Exertion and the physical struggle increase risk

Asked about his excited delirium (ED) diagnosis he said it was based on:
Behavioral symptoms of ED
Sweating and the rectal temperature of 102.2 F postmortem
Methamphetamine in blood and history of abuse

Asked about how ED causes death he said that ED seems to be a condition of altered neurotransmitter function in the brain that may cause death or a heart arrhythmia, but it is not clear how. He said it is clear that when a person has ED behaviors there is an increased risk for sudden death that is sometimes associated with stimulant drugs like methamphetamine but it can be just from major psychiatric disease.

Dr. Holt said that it is known that the "cool down period" after major exertion in police restraint situations while the detainee is just laying there still handcuffed there is an increased risk of sudden death. It may have to do with rising levels of adrenaline and noradrenaline after the event. It may have to do with the rising temperature from the neurotransmitter storm in the brain. Why the heart actually goes into an arrest is not clear. It is an association, he said. They (victims of ED death) don't arrest during the struggle, they arrest after they stop the struggle, he opined (page 107).

When asked, the doctor said he had excluded asphyxia, taser shocks, blunt trauma and asphyxia as contributing causes of death.

He said his understanding of the restraint events was just from the coroner investigators and as he understood it the police were just controlling the shoulders and legs.

**Background Discussion of Restraint Asphyxia**

7

In the 1970's and early 1980's it became clear that attempts to use neck holds, derived from grappling sports and the martial arts, in the law enforcement arena as a "less lethal" means of subduing suspects was resulting too often in unexpected deaths.  Physician medical examiner researchers published articles in scientific and medical research journals, and discussed the mechanisms of death from the two main types of neck holds taken from martial arts disciplines like judo.  The choke hold and the carotid "sleeper" hold, also referred to as the lateral vascular neck restraint (LVNR), were effective and relatively safe in subduing trained athletic opponents in sports settings with rules and referees.  However, relatively unskilled police officers attempting to use the same holds on resisting subjects in uncontrolled real world settings while trying to attach handcuffs was causing unnecessary, preventable deaths.

In the late 1980's, subduing uncooperative suspects using prone restraining techniques gained in popularity as a non-lethal means of gaining physical control by law enforcement agents.  After being forced to the ground in a prone (chest down) position, subjects would be held down in whatever way worked until mechanical restraints could be applied.  The usual mechanical restraints were handcuffs, leg restraints of various sorts, and sometimes cords, straps or clips to connect the handcuffs to the leg restraints.  The process of essentially binding the hands to the feet has many terms to describe it, such as "hobbling" or "total appendage restraint procedure" (TARP).  In some cases the terms have different meanings to different agencies.  The shortened term "hogtying" is widely used for this restraining technique.  Hogtying can be loose, with the hands and feet far apart, or tight, with the hands and feet cinched close together, generally behind the buttocks.  Tight hogtying can cause the knees to be held off the ground and the back to bow when the subject is prone.

Deaths were noticed associated with custody hogtying in the late 1980's and early 1990's, and again were reported in the forensic medical literature, prompting discussions and publications in the law enforcement arena.  The first forensic pathology reports of such deaths postulated "positional asphyxia" as the probable cause of death.  Positional asphyxia was a term already in use by forensic death investigators prior to general recognition of the custody hogtying death phenomenon.  Positional asphyxia as originally used referred to deaths caused by passive entrapment of people in positions that prevented adequate breathing.  Dr. Reay in Seattle initially hypothesized that the death of suspects first noticed to be unresponsive while in prone hogtied positions in the back of police cars meant that that they must have been conscious and breathing when they were left unattended in the cars.  Thus, he chose the "positional asphyxia" term to classify and describe deaths in custody while hogtied when there was no other apparent cause.  His opinion changed on the validity of that assumption in later years, but the term persisted.

"Restraint asphyxia" is a term introduced to replace the term "positional asphyxia" for asphyxial entrapment deaths caused by active restraint by other people.  The "positional asphyxia" term often lead to confusion and misunderstandings about whether the cause of the deaths discussed was related to being in a restrictive, passive, prone hogtie (or otherwise subdued and bound) position, or whether the cause of death was due to the methods used to immobilize the subject during subdual while being mechanically bound.  Currently in sudden custody death situations "positional asphyxia" and "restraint asphyxia" are still often used as if interchangeable.  Though asphyxia during active restraint can be caused by compressing the mouth and nose, or by compressing the neck, most of the deaths are related to compression of the torso, especially the chest.

8

000040

Understanding the causal mechanism of death in restraint asphyxial situations is important in that the deaths are most likely preventable by using safer techniques for subduing and restraining.  In situations of restraint asphyxia by chest compression, anything done to reduce the compressive, restrictive force on the chest, or anything done to decrease the time a subject is forcefully restrained in a restrictive position, can prove life saving.  Using as little weight on the back as possible for as short a time as possible will decrease the chance of death.  Pinning the arms and legs to the ground to hold a subject down is better than using the compressive force of the restrainers' hands, knees, feet or torso on the back of the prone subject to hold him/her down while attempting to apply handcuffs and other mechanical restraints.  Rolling the subject onto his/her side as soon as possible can also prevent death by allowing the subject easier breathing and by allowing blood to flow unimpeded to and through the heart.  Finally, frequently monitoring the subject to see if he/she is maintaining consciousness is critically important to quickly discover and hopefully prevent an emerging life threatening catastrophe caused by inadequate delivery of oxygen to the brain and heart.  Having an officer or other person specifically assigned to closely monitor the subject's mental status and other vital signs during the restraint process can prevent death.  Too often it seems each officer involved is focused on his or her own particular part of trying to get the subject mechanically restrained, while being unaware that the detainee's life is slipping away in the officers' collective hands.  Techniques to help prevent asphyxia during subdual and the application of handcuffs and other mechanical restraints are generally not hard to do and have been discussed in police literature for at least 20 years.

### Excited Delirium v Restraint Asphyxia Mechanisms of Death

"Excited Delirium" is a poorly and variably defined condition, not widely used or accepted in general medicine or specifically in the specialty of psychiatry.  Recently a panel of doctors in the specialty of emergency medicine wrote a white paper recognizing excited delirium syndrome as a condition.  In it they proposed changing the abbreviation from "ED" or EDS" to "ExDS".  Prior to the emergency medicine white paper, Dr. Vincent Di Maio, a forensic pathologist and former medical examiner in San Antonio and his wife in their 2005 book proposed that deaths caused by excited delirium should be referred to as "Excited Delirium Syndrome" (the title of his book) and should be abbreviated as "EDS" to distinguish it from the mental/physiological state of ED.  Essentially, they proposed that when a person in the psychological state of excited delirium suddenly dies from it, it should be called the excited delirium syndrome.

Whatever term or abbreviation is used, there is a disturbing lack of understanding of a mechanism by which excited delirium can suddenly kill people and a disturbingly tight temporal association with in-custody sudden deaths involving manual restraint.  In fact, deaths that occur in tight temporal association with custody restraint involving close physical contact between the restrainers and the subject, who is almost invariably being restrained prone on the ground when signs of loss of consciousness first appear, make up most of the reported cases of excited delirium deaths.  Some writers consider using illicit stimulant drugs, like cocaine and methamphetamine, along with being actively restrained by police to be part of the excited delirium syndrome.

Some of the articles that generally discuss ED deaths say that such deaths usually occur shortly after the restraint and struggle stop.  They invoke the concept that somehow the

9

minutes after the extreme exertion are a "period of peril". This period of peril is hypothesized to be a time of an "adrenaline surge". Such a surge of adrenaline has not been scientifically established, however. In my observations of scores of prone compressive restraint asphyxia deaths in police custody, loss of consciousness invariably occurs while the subject is being actively compressed, either before or after handcuffing is completed. Loss-of-consciousness is almost invariably followed by permanent brain damage or death minutes later. During the post exertion "period of peril" the gravity of the subject's condition is often noticed, but detailed investigation of what actually happened usually indicates the loss of consciousness happened during the restraint process. Usually that process is prone compression.

Delirium is a state of confusion caused by brain dysfunction with many causes. When associated with hyperactivity as part of the confusion state it is sometimes called "agitated" or, "excited" delirium. Delirium, whether agitated or not, is not a disease itself. Rather, it is a symptomatic manifestation of some underlying disease or toxic state affecting brain function. For example, delirium is reportedly seen in about 50% of patients in hospital intensive care units during their stay, where it is often associated with infections or other causes of decreased oxygen delivery to the brain. Diabetics with very low glucose levels often are delirious because the brain needs a steady supply of enough glucose, in addition to enough oxygen, to function normally. Correcting the underlying problem usually restores the brain to normal function and the delirium goes away. Many drugs or poisons can cause delirium. People who are delirious do have a several-fold increased chance of dying compared to those who are not delirious. But the vast majority of people who are delirious don't die. Those who do die rarely die from being delirious; instead, they die from the underlying disease process that caused the delirium in the first place.

Most of the reported cases of excited delirium deaths are of cocaine induced excited delirium and originated in Miami. Debora Mash, PhD, a Miami researcher using brains from purported excited delirium death victims, at one time said she believed the mechanism of death was hyperthermia and that the elevation of body temperature develops over a relatively long time. Dr. Di Maio believes the mechanism of death is probably akin to an adrenaline overdose. Dr. Charles Wetli, who first coined the term "excited delirium" in a 1985 paper reporting a handful of cocaine using men who died suddenly during police arrest and restraint situations in Miami-Dade County, has stated he doesn't know the mechanism of death.

In my opinion, the probable cause of death in most prone restraint cases with loss of consciousness during restraint is asphyxia by chest/abdominal compression during the restraint process. *Asphyxia* in this case is used in the broad application of the term – meaning a process causing decreased oxygen availability to cells. Cells make up all organs of the body, including the very oxygen-deprivation sensitive heart and brain. The heart and brain need a fairly continuous supply of oxygen to continue to function normally and not be damaged. Inhibition of respiration (breathing) and/or inhibition of cardiac functional output (blood flow) caused by too much weight on the back for too long can cause asphyxia and death.

Compression of the chest and abdominal area can cause asphyxia in two ways. Weight on the back of a person who is unable to use his arms or legs to relieve pressure makes breathing more difficult since a person must use the relatively weak muscles of breathing (primarily the diaphragm and intercostal muscles) to expand the chest and lift the weight

10

enough to allow air to flow into the lungs from ambient air pressure during the breathing process.  With time and with sustained weight, or too much weight applied over a shorter time, those muscles become exhausted and can no longer lift the weight enough to breathe and deliver oxygen to the blood being pumped through the lungs.  Compression of the thorax can also cause the low-pressure veins bringing blood to the heart to collapse, or the lower pressure chambers of the heart to collapse as they are compressed against the spine, such that blood cannot get into the heart to be pumped out.  Without blood being pumped oxygen will not get to the brain or to the specialized muscles of the heart.  Not getting oxygen to the brain causes loss of consciousness and eventually death.  Not getting oxygen to the heart causes arrhythmias, cardiac arrest and eventually death, too.


## Conclusions (opinions) and Bases

Note that all of my opinions expressed herein are to a reasonable degree of medical probability or certainty unless expressed otherwise.

**Conclusion 1 –** In my opinion, the probable cause of Mr. Serrano's death is asphyxia by compression of his trunk (chest/abdomen) while being held prone by the weight of three police officers for 2-5 minutes.

Conclusion 1 is based on the history of restraining process; the loss of vital signs while being compressed; the combined weight of the restraining officers well in excess of 600 pounds with typical police gear; the admission by police that at least two officers were exerting themselves hard to hold down the subject who kept trying to get up, and the timeline.

To elaborate, the existing timeline as I know it indicates there was a 4-5 minute interval between the end of the last taser discharge and the time of call for an ambulance. Officers reported that when they noticed Serrano was unresponsive they immediately got off him, check for signs of life then immediately called for an ambulance.  It is unclear how long after the last taser discharge Serrano was fully handcuffed behind his back, but it is clear from officer statements that they started the handcuffing process immediately and forcefully while keeping Serrano held on the ground and prone.  It is clear that they held him down with body weight.  Two officers (Harris and Bornsheur) were using their body weight to hold down his upper back area.  Salazar was holding down Serrano's legs.  The weight on the legs prevented Salazar from lifting his pelvis and his fat belly so that he could breathe.  The weight on his chest prevented his chest from expanding. Combined, the weight did not allow breathing without lifting hundreds of pounds just with Serrano's breathing muscles.  Muscles weaken quickly with maximal exertion.  When too weak the air is forced out and the chest can no longer expand for breathing.  Asphyxia occurs.  It can take as little as two minutes for an exhausted person who cannot breathe to loose consciousness.  Not long after respiratory arrest the heart will stop functioning because, like the brain, it also needs oxygen to function.

In other words, Mr. Serrano would not have died that day if he had not been restrained the way he was to get him handcuffed.  After he was handcuffed the 3 officers continued to compress his prone body until they noticed him stop making noises and then stop moving.  Bornsheur said, "Okay, it looks like he is out right now."  Serrano was indeed

"out" then.  Had officers not continued to compress Serrano's body after they handcuffed him probably would not have died that day.  He never regained any signs of life and he was pronounced dead some 46 minutes later in the emergency room after extensive efforts to save his life.

**Conclusion 2 –** I agree in part with Dr. Holt's opinions expressed at deposition, namely, I agree that the stress of heavy exertion such as Serrano experienced during the restraint struggle with police could alone cause a fatal cardiac arrhythmia.  I also agree that his obesity and slight heart enlargement put him at greater risk.

Conclusion 2 is based on known and generally accepted risk factors for sudden cardiac death.

**Conclusion 3 –** Based on the circumstances and autopsy findings of Mr. Serrano's death, I would certify the death as follows:

Cause of death – Restraint asphyxia from chest compression
Contributing causes – methamphetamine intoxication; obesity
Manner of death – Homicide

Conclusion 3 is based on the strong evidence for compressional asphyxia; the obviously mental and behavioral disturbance caused by methamphetamine putting Serrano in a confrontational situation with police that he couldn't handle considering his mental impairment, and the clear evidence that loss of consciousness leading to death was "at the hands of others".  "Homicide" in coroner/medical examiner usage for death certification means death caused by some other person's deliberate action, but does not necessarily imply intent to harm.

**Conclusion 4 –** I disagree with the Coroner's decision to include "excited delirium" as part of the cause of death.  I think the term has been way over used in sudden custody deaths and serves to discourage thoughtful analysis of such deaths.

Conclusion 4 is based on careful analysis of the circumstances of approximately 100 sudden custodial deaths with restraint over the past 25 years.  I have also read extensively about what has been called excited delirium and excited delirium syndrome.  There are many flaws in the concept.

One flaw is that ED has no clearly established mechanism to explain death.  One of the first, which has mostly fallen to the way side, is hyperthermia.  Stimulant drugs like methamphetamine, especially coupled with heavy exertion as was seen in Mr. Serrano, frequently cause an elevation in core body temperature.  Though stimulants can on rare occasion cause life threatening elevations of body temperature, I have only seen it in one case.  In Serrano's case his rectal temperature was taken at the hospital just 23 minutes after he died.  If that was done at the request of the Coroner's staff, they should be complimented for doing so.  But 102.2°F is barely 2.5 degrees above the normal average.  That is not life threatening.  106°F and above is life threatening.  Assuming that the rectal temperature was higher an hour earlier, when Serrano lost consciousness and other signs of life, is an invalid assumption also.

Eventually, a dead body will begin to loose core body warmth at a rate of about 1.5 degrees per hour at room temperature as the cooling at the skin surface spreads inward.

12

000044

However, studies have shown that in the first couple hours after death the core body temperature many times actually rises a degree or two and only rarely drops more than a degree.  One good explanation for this phenomenon is that once the heart stops beating, warm blood is no longer pumped to the cooler skin surface where the blood looses heat and normally helps keep the core body temperature in the 99 degree range. In short, when the heart stops the core of the body looses its circulatory cooling system. A rectal temperature is a good measure of the core body temperature because it is deep inside several inches of insulating tissue.

**Closing Remarks**

The foregoing conclusions are stated to a reasonable degree of medical or scientific probability or certainty based on my background, training, and experience and my review of the record materials previously identified.  I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that become available to me, at which time a supplemental report may be submitted.


Respectfully,

Ronald L. O'Halloran, MD


13

000045

**E X H I B I T   E**

STEVEN D. MANNING
DENNIS B. KASS
ANTHONY J. ELLROD
EUGENE P. RAMIREZ
FREDRIC W. TRESTER
LAWRENCE D. ESTEN
MILDRED K. O'LINN •
THOMAS R. GILL
ALFRED M. DE LA CRUZ
ERWIN A. NEPOMUCENO
DAVID J. WILSON
BRIAN T. MOSS •
JEFFREY M. LENKOV
MARGUERITE LEEH JONSK
JOHN D. MARINO
MICHAEL L. SMITH
LOUIS W. PAPPAS
SHARI L. ROSENTHAL
EUGENE J. EGAN
CLIFFORD A. CLANCEY
RINAT B. KLIER-ERLICH
ROBERT B. ZELMS †
R. ADAM ELLISON
SCOTT WM. DAVENPORT
JASON J. MOLNAR •
KATHLEEN A. HUNT •
STEVEN J. RENICK
JAMES J. PERKINS •
PATRICK L. HURLEY
JAMES E. GIBBONS
DANIEL B. HERBERT •
MICHAEL J. GREEN
DARIN L. WESSEL •
L. TREVOR GRIMM
MARK A. HAGOPIAN
DAVID GORNEY
SUZIE ZACHAR IRWIN †

DONALD R. DAY*
ALAN C. JABLIN *
D. HIEP TRUONG
TIMOTHY J. KRAL
MICHAEL A. WEISMANTEL
JANET D. JOHN *
KEVIN H. LOUTH
TRACIE L. CHILDS
SHAUN S. JEFFREY
CANDACE E. KALLBERG
DAVID R. REIDER *
TOBY D. BUCHANAN
LADELL H. MUEHLESTEIN
PETER C. CATALANOTTI
SEVAN GOREL
RICHARD G. GARCIA
MADONNA A. HERMAN
LAURA M. SPEAKMAN
DAVID V. ROTH
JOHN M. HOCHHAUSLER
ANTHONY S. VITAGLIANO †
BRIAN S. MIZELL
JOHN M. COWDEN
KEITH RECKER †
DEBORA VERDIER †
ELIZABETH MURPHY
MARY E. WORK
ANDRIJ J. SEMOTIUK *
JULIE M. FLEMING
ROBERT E. MURPHY *
NINA RICCI FRANCISCO
PAKI K. SCROGGIN *†
CHRISTOPHER R. ALLISON
DONALD R. BECK
VICTOR ROCHA
JOSHUA B. SHAYNE
MARK H. HERSKGOTZ *

PAUL HANNA
KENNETH S. KAWABATA
LARRY S. DUSHKES
ANNEMARIE MCDOWELL
JENNIFER SUPMAN
MINAS SAMUELIAN
TONY M. SAIN
CHRISTOPHER KANJO
LORI B. WADE
LALO GARCIA
CHARLIE FU
FRANK M. LAFLEUR
ROBYN PARK FREIBERG
DAVID M. GRUEN
ROBERT P. WARGO*
SCOTT A. ALLEN †
REBECA VALENZUELA
ALEJANDRO CARAVEO
DEBORAH DORNY
MARILYN R. VICTOR*
STEVEN AMUNDSON
MATTHEW P.C. NOEL
MAHASTI KASHEFI
SARAH E. DONALD
FRANK CHANG
JONATHAN J. LARRIUM
KRIS J. MOTSCHENBACHER
JASON W. SCHIFFIAI
PATEEL BOYADJIAN
GENE W. LEE
LISA WONG
KAREN LUH
MARTIN HOLLY
MICHAEL PREIS
CHRISTOPHER WARREN
DANIEL HERNANDEZ
JEFFREY S. OSSER

MOLLIE NOKES
DONALD APPLEGATE
JONATHON D. SAYRE
HEATHER M. ANTONIE
KAREN LEAO
KATIE ALLEN
CAROL HERRERA
JASON DOSHI
AMY L. POPE
GAETANO TESTINI †
LITAL GILBOA
TAMARA DARWEESH
JULIA TSAE
JASON BROWN
ZUBIN FARINPOUR
PAUL McCOLLUM
VICTORIA DIJNNE
LAURA McADAMS
CHRISTINE WALTON
VI APPLEN
GRETHCHEN COLLIN
ARTIN AVETISOVE
RODDRIGO J. BOZOGHLIAN
MIRIAM RENZI
MELISSA LEBLANC
DANIEL FABIANO
SHANE MORRISON
JANETTE GLASER
LESLEY POWERS
ANGELA POWELL
ARI STELLER
ANDREY CHUJA
MAX HIGGINS
MATTHEW WEINER
SEAN DOWSING
KYRA BUCH
MICHAEL LE
OF COUNSEL
DONALD S. SMITH*
THOMAS R. WAGNER

# MANNING &KASS
# ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW



15TH FLOOR AT 801 TOWER
801 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 624-6900
FACSIMILE: (213) 624-6999
WEB SITE: WWW.MANNINGLLP.COM

May 6, 2014

*VIA E-Mail, Fax, and U.S. Mail*

Francisco A. Suarez, Esq.
Law Offices of Francisco A. Suarez
301 W. Mission Boulevard
Pomona, California 91766
francisco.a.suarez@verizon.net
Fax: (909) 469-5113

Jorge Gonzalez, Esq.
A Professional Corporation
2485 Huntington Drive, Suite 238
San Marino, California 91108
jggorgeous@aol.com

Re: **Estate of Hutalio Serrano-Granados, et al. v. City of Colton, et al.**
Case No.: CV13-00519-JAK
Incident Date: 01/15/12
Our File No.: 01815-039697

Dear Mr. Suarez and Mr. Gonzalez:

This letter follows-up on the telephone conversation that took place on May 5, 2014 at approximately 2:00 pm between plaintiffs' counsel Jorge Gonzalez and defendant's counsel Mildred O'Linn and Tony Sain. This letter will serve as a further conference pursuant to C.D. Cal. L.R. 7-3 and/or 37-1 regarding our attempt to resolve the issues arising from the plaintiffs' designation of Ronald L. O'Halloran, M.D. as a plaintiffs' expert in the *Serrano v. Colton* case.

Defense counsel initiated this telephone conference in light of their receipt of the plaintiffs' designation of experts, in which the plaintiffs' identified Dr. O'Halloran as one of their expert witnesses. As Mr. Gonzalez was advised during the telephone conversation, defense counsel consulted with Dr. O'Halloran about this case, preliminary to potentially retaining him as an expert witness in this matter on behalf of the defendant. Dr. O'Halloran had previously been used by this office as an expert witness in the *K. Munoz v. County of San Bernardino* case, on which Mr.

Francisco A. Suarez, Esq.
Jorge Gonzalez, Esq.
**Re:     Estate of Serrano-Granados v. City of Colton**
May 6, 2014
Page 2

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP

Gonzalez also served as plaintiffs' counsel. Defense counsel had substantive attorney work product communication with Dr. O'Halloran about the Serrano matter – including review of testimony, attorney opinions and tactical discusssions/plans, and other confidential information.

Specifically, our records indicate that on December 17, 2013, after an exchange of preliminary emails, defense counsel had a over 36 minute teleconference with Dr. O'Halloran regarding the Serrano matter. The conversation between defense counsel and Dr. O'Halloran included the state of discovery and of the deposition testimony, including an extensive discussion of M.E. Holt's deposition testimony taken less than two weeks prior (significantly, in his report for plaintiffs, Dr. O'Halloran has an entire section about Dr. Holt's deposition, even though that deposition is not listed among the materials that he identifies reviewing in preparing his report); defense attorney opinions re same; preliminary defense tactical plans and mental impressions of case; and confidential information about the defense case and the client.

During the telephone conversation of May 5, Mr. Gonzalez advised Ms. O'Linn and Mr. Sain that, when plaintiffs' counsel first contacted the doctor, Dr. O'Halloran had informed Mr. Gonzalez that the doctor had previously spoken to our office about this case, but (per Mr. Gonzalez) Dr. O'Halloran related that the discussion with defense counsel was not very extensive. As indicated above, the discussion between defense counsel and Dr. O'Halloran was, in fact, extensive.

The case law is clear that under these circumstances, there has been a violation of the defendant's attorney-client and attorney work product privileges. This issue was extensively discussed in a case that is very similar factually: *Shadow Traffic Network v. Superior Court,* 24 Cal.App.4th 1067 (1994). Several federal court opinions have referenced and/or relied on *Shadow Traffic,* recognizing that it is applicable to the issue of disqualification in the federal, as well as the state, courts. *See, e.g., Godby v. United States Dist. Court,* 2000 U.S. App. LEXIS 17945 (Case No. 99-71298) (9th Cir. July 14, 2000) (applying *Shadow Traffic* to a case arising out the Arizona District Court) and *Kane v. Chobani, Inc.,* 2013 U.S. Dist. LEXIS 109900, *25, *55 (Case No. 12-CV-02425-LHK) (N.D. Cal. Aug. 2, 2013).

In *Shadow Traffic,* the plaintiff's attorneys had consulted with "representatives from Deloitte & Touche, a 'Big-Six' accounting firm, to discuss the possible retention of individuals from that firm as expert witnesses to testify in the upcoming trial." (*Id.* at 1071.) They later decided not to retain Deloitte & Touche as experts in the case. (*Id.* at 1072.) Thereafter, defense counsel also contacted Deloitte & Touche and ended up hiring them as experts in the case, even though the defendants were informed that plaintiff's counsel had previously consulted with the firm about serving as their expert. (*Ibid.*) When plaintiff's counsel learned of the retention of Deloitte &

Francisco A. Suarez, Esq.
Jorge Gonzalez, Esq.
Re:   **Estate of Serrano-Granados v. City of Colton**
May 6, 2014
Page 3

Manning&Kass
Ellrod, Ramirez, Trester llp

Touche by the defendant, the plaintiff moved to disqualify defense counsel. It was unnecessary for it to move to disqualify Deloitte & Touche, because the firm had withdrawn from the case. (*Id.* at 1072-1073.)

The Court of Appeal affirmed the trial court's order disqualifying defense counsel. (*Id.* at 1071.)  The appellate court held "that communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality."  (*Id.* at 1080; footnote omitted.)  The Court further concluded "that substantial evidence supports the trial court's implicit finding that [plaintiff's counsel] imparted confidential information to Deloitte & Touche even though Metro subsequently chose not to retain the firm as an expert witness." (*Id.* at 1084.)

As to whether this confidential information was then disclosed to defense counsel, the appellate court wrote that:

> "Deloitte & Touche was privy to confidential information about Metro's action against Shadow, including counsel's theories on damages. Damages was the very topic Bottger conceded he had discussed with Thompson. Even assuming that Bottger did not expressly ask Thompson about the contents of his discussion with Andrews & Kurth  and that Thompson did not explicitly disclose the information to Bottger, Bottger could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice Thompson rendered to Shadow. Given that both Metro and Shadow consulted Thompson on the same issue – Metro's damages – it is highly unlikely that Thompson could conscientiously discharge his duty to Shadow as its retained expert and at the same time discharge his duty not to divulge confidential information received from Metro. [Citation.]" (*Id.* at 1086.)

The factual circumstances here are very similar to those in *Shadow Traffic.*  Plaintiffs' counsel were aware that Dr. O'Halloran had consulted with defense counsel about this case – before plaintiffs retained Dr. O'Halloran.  Confidential information was conveyed by defense counsel to Dr. O'Halloran before that retention, including regarding issues discussed in Dr. O'Halloran's report. Even if plaintiffs' counsel did not inquire about that confidential information, and even if Dr. O'Halloran did not explicitly disclose that information, the disclosure must be presumed here, because the plaintiffs "obtain[ed] the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice [Dr. O'Halloran] rendered to [the

000049

Francisco A. Suarez, Esq.
Jorge Gonzalez, Esq.
Re:    **Estate of Serrano-Granados v. City of Colton**
May 6, 2014
Page 4

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP

plaintiff]. Given that both [parties] consulted [Dr. O'Halloran] on the same issue ... it is highly
unlikely that [Dr. O'Halloran] could conscientiously discharge his duty to [the plaintiffs] as [their]
retained expert and at the same time discharge his duty not to divulge confidential information
received from [the defendant]."

As we noted in our call, both Dr. O'Halloran and plaintiffs' counsel may be subject to
disqualification from further participation in the case due to the unusual procedural posture of this
matter.

However, to avoid the need for defendant to bring a motion to resolve this issue, defense
counsel thus advised Mr. Gonzalez that defendant City would be willing to stipulate to a joint
request for a reasonable amount of additional time for plaintiffs to designate an alternative medical
expert in this matter: if the plaintiffs agree (as they should) to withdraw their designation of Dr.
O'Halloran and to exclude all reference to his opinions in this case.

Please let us know in writing **no later than 5:00 p.m. Wednesday (May 7, 2014)** whether
plaintiffs will agree to withdraw Dr. O'Halloran as their expert in this case and to omit and exclude
all reference to his opinions in this matter, so as to avoid the need for the defendant to pursue a
motion to disqualify/exclude Dr. O'Halloran, and possibly plaintiffs' counsel as well.

Please feel free to contact us if there is anything else on this matter we need to discuss.
Thank you.

Very truly yours,

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

Mildred K. O'Linn, Esq.
Tony M. Sain, Esq.

MKO/TMS/dxf
G:\docsdata\MKO\Serrano\Letters\PC-007 Disqualification M&C.050614.wpd

E X H I B I T   F

# JORGE GONZALEZ
## A Professional Corporation
### 2485 Huntington Drive, Suite 238
### San Marino, California 91108

| | |
|---|---|
| Telephone: 213-598-3278 | E-mail: jggorgeous@aol.com |

May 7, 2014

Mildred K. O'Linn, Esq.
Tony M. Sain, Esq.
MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017

      Re:   Hutulio Serrano v. City of Colton
            USDC No.  CV 13-00519 JAK

Dear Ms. O'Linn and Mr. Sain:

In reference to your "meet and confer" letter dated May 6, 2014, allow me to respond as follows:

    I hereby respectfully decline to withdraw Dr. O'Halloran as an expert in this case on the grounds that, as I have already described to you, when I spoke to Dr. O'Halloran about his previous contact with your firm, he indicated the case sounded similar to one he spoke to Mr. Sain about, but that he had not engaged in substantive discussions.

    I have read the California case you cited, and although I do not argue with the decision and its reasons therein, I believe there are distinct differences that militate against its application here.

    Suffice to say that the federal courts have dealt extensively with this issue, and at least one circuit court and various lower courts have adopted the approach taken in *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 273 (S.D. Ohio 1988), which set the standard primarily relied upon.  See for example, *Koch Refining Co. v. Jennifer L. Boudreaux, MV*, 85 F.3d 1178, 1180-82 (5th Cir. 1996); *English Feedlot, Inc., v. Norden Lab, Inc.*, 833 F.Supp. 1498 ((D.Colo. 1993); *Wang Laboratories, Inc.*, 762 F.Supp. 1246, 1247-48 (E.D. VA. 1991); *Great Lakes Dredge & Dock Co. v. Harnishfeger Corp.*, 7334 F.Supp. 334-338-39 (N.D. Ill. 1990).

    In *Paul*, a case where the defendant had engaged in significant discussions with an expert in the field of testing helmets, defendants sought to disqualify the expert from testifying on behalf of plaintiff.  First, the court, acknowledging the paucity of cases on the subject, found it had the inherent power to disqualify an expert.  *Id.* at 278.  However, it specifically declined to borrow principles from the attorney-client privilege context, and relied on practical determinations in finding that:

000052

The proper focus in such situations is to determine, first, whether the attorney or client acted reasonably in assuming that a confidential or fiduciary relationship of some sort existed, and if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate. *Id.* at 277.

In applying the test, the court asked three questions:

(1)  Did the expert witness enter into a relationship which gave rise to an objectively reasonable expectation on the part of the first party that it could disclose confidential information; (2)  Did the first party actually disclose confidential information to the expert witness; and (3)  Did the first party make a showing that the expert witness has used or may use such confidential information to the first party's disadvantage. *Ibid.*

The important factor is whether the party moving for disqualification can show any "demonstrable prejudice," or that he was "unduly disadvantaged" by allowing the expert to testify under the circumstances. *Id.* at 280.  In *Paul* the court determined that while Rawlings might have had a reasonable belief it had entered into a confidential relationship with the expert, it had not met its burden of demonstrating they had communicated matters of particular substance to him such as to place them in a position of disadvantage. The nature of the information was too tenuous and weak to merit the strong protection of the harsh remedy of disqualification.

It is safe to say that the courts have accepted the *Paul* test.  Kendall Coffey, *Inherent Judicial Authority and the Expert Disqualification Doctrine*, 56 Fla. L. Rev. 195, 210-211 (2004).

Although you may have used Dr. O'Halloran in the past (such as in Munoz, a shooting death case where he testified to the impact of bullets to the body and cause of death), such a relationship cannot be the basis for disallowing his use by other parties, including those in direct conflict with you.  Attorneys are advocates.  "Expert witnesses, on the other hand, are employed to assist the parties in their pretrial preparation, and if called to testify, to give their unbiased opinion in order to assist the trier of fact in understanding the relevant evidence." *Stencel v. Fairchild Corp.*, 174 F.Supp.2d 1080, 1085-86 (C.D. Cal. 2001)

In the words of Judge Feess (C.D. Calif), "at least in theory, the expert witness, like all other witnesses, is beholden to the truth first, and the party second, if at all. *Id.* at 1086.

I would venture to say that your firm knows of Dr. O'Halloran's integrity. I am sure that is why you are willing to hire him on occasion when the right case presents itself.

The burden of meeting the three parts of the *Paul* test rests on that of the party moving for disqualification.  Dr. O'Halloran told me this case sounded similar to one he had talked to Mr. Sain about.  I inquired whether he had engaged in substantive discussions.  He stated he did not recall anything except the autopsy had been conducted by Dr. Holt, and that his deposition had recently been taken.  He indicated Mr. Sain told him he would get back to him and he never heard back from Mr. Sain.

If the record supported a long series of interactions, with significant discussions of the defense theories, trial tactics, etc., the situation might be different. *Marvin Lumber Co. v. Norton*, 113 F.R.D. 588, 591 (D.Minn. 1986). However, if the expert met but once with counsel, was not retained, was not supplied with documentation or relevant data, and was not requested to perform any services, courts have found the evidence supported a finding that the meeting was an informal consultation rather than a full-fledged confidential long-term relationship. *Mayer v. Dell*, 139 F.R.D. 1, 3-4 (D.D.C. 1991). See also, *Wang Lab*, *supra*, 762 F.Supp. at 1249, n. 5; *Nikkal Ind., v. Salton, supra*, 689 F.Supp. at 190.

The courts must balance the competing policy objectives in determining expert disqualification issues. On the one hand, the court must prevent conflicts of interest and maintain the integrity of the judicial process. On the other hand, militating against disqualification are the interests in ensuring parties have access to experts with specialized knowledge, and allowing experts to pursue their professional calling. *English Feedlots, supra*, 833 F.Supp. at 1504-5.

Based on the conversation I had with Dr. O'Halloran, the one telephonic conversation between he and Mr. Sain was not significant enough to support a finding that there was a reasonable expectation that a confidential relationship existed, that significant confidential information was revealed or shared, nor that the information was of such a nature as to put defendants in an unduly disadvantaged position in this litigation. Indeed, a serious reading of his report makes clear nothing of any confidential value had been imparted to him by defense counsel that somehow made its way into his thinking and analysis.

I note your letter cites Dr. O'Halloran's extensive reference to Dr. Holt's deposition and findings as support that he relied on Mr. Sain's conversation with him. The failure to list it in the material he reviewed was merely an inadvertent omission. I provided it to him. This argument has little merit.

Based on the foregoing brief arguments, plaintiff hereby declines to withdraw Dr. O'Halloran as an expert, including his opinions and conclusions.

Sincerely,


Jorge Gonzalez, Esq.

000054

**E X H I B I T   G**

000055

STEVEN D. MANNING
DENNIS B. KASS
ANTHONY J. ELLROD
EUGENE P. RAMIREZ
FREDRIC W. TRESTER
LAWRENCE D. ESTEN
MILDRED K. O'LINN •
THOMAS R. GILL
ERWIN M. DE LA CRUZ
DAVID J. WILSON
BRIAN T. MOSS •
JEFFREY M. LENKOV
MARGUERITE LIEU JONAK
JOHN D. MARINO
MICHAEL L. SMITH
LOUIS W. PAPPAS
SHAW L. ROSENTHAL
EUGENE J. EGAN
CLIFFORD A. CARACCO
RINAT B. KLIER-ERLICH
ROBERT B. ZELMS †
R. ADAM ELLISON
SCOTT WM. DAVENPORT
JASON J. MOLNAR •
KATHLEEN A. HUNT •
STEVEN J. RENICK
JAMES J. PERKINS •
PATRICK L. HURLEY
JAMES E. GIBBONS
DANIEL B. HERBERT •
MICHAEL J. GREEN
DARIN L. WESSEL •
L. TREVOR GRIMM
MARK A. HAGOPIAN
DAVID GORNEY
SUZIE ZACHAR IRWIN †

DONALD R. DAY•
ALAN C. JABIN •
D. HELP TRUONG
TIMOTHY J. KRAL
MICHAEL A. WEISSMUTH
JANET D. JOHN •
KEVIN H. LOUTH
TRACIE L. CHILDS
SHARON S. JEFFREY
CANDACE E. KALLBERG
DAVID R. REEDER •
TOBY D. BUCHANAN
LADELL H. MUHLESTEIN
PETER C. CATALANOTTI
SEVAN GOBEL
RICHARD G. GARCIA
MADONNA A. HERMAN
LAURA M. SPEAKMAN
DAVID V. ROTH
JOHN M. HOCHHAUSER
ANTHONY S. VITAGLIANO †
BRIAN S. MIZELL
JOHN M. COWDEN
KEITH RECKER †
DEBORA VERBIER †
ELIZABETH MURPHY
MARY E. WORK
ANDREW J. SEMOTIUK •
JULIE M. FLEMING
ROBERT E. MURPHY •
NINA RICCI FRANCISCO
PARI K. SCROGGIN •†
CHRISTOPHER P. ALLISON
DONALD R. BECK
VICTOR ROCHA
JOSHUA B. SHAYNE
MARK H. HERSKOVITZ •

PAUL HANNA
KENNETH S. KAWABATA
LARRY S. DUSHKES
ANNA MARIE MCDONNELL
JENNIFER STIPMAN
MINAS SAMRTHIAN
LYNN M. SAROYAN
CHRISTOPHER KANJO
LORI B. WADE
LALO GARCIA
CHARLIE FU
FRANK M. LAFLEUR
ROBYN PARK FREIBERG
DAVID M. GRUEN
ROBERT P. WARGO•
SCOTT A. ALLES †
REBECA VALENZUELA
ALEJANDRO CARAVEO
DEBORAH DORNY
MARILYN R. VICTOR•
STEVEN AMUNDSON
MATTHEW P.C. NOEL
MAHASTI KASHEFI
SARAH E. DONALD
FRANK CHANG
JONATHAN J. LABRUM
KRIS J. MONCHESACHOR
JASON W. SCHEAM
PATEL BOYADJIAN
GENE W. LEE
LISA WONG
KARL's LUEH
MARTIN HOLLY
MICHAEL PREIS
CHRISTOPHER WARREN
DANIEL HERNANDEZ
JEFFREY S. OSSER

MOTIE NOKES
DONALD APPLEGATE
JONATHAN D. SAYRE
HEATHER M. ANTOINE
KORUS LEE
KATIF ALLEN
CAROL HERRERA
JASON DONHE
AMY L. POPF
GAETANO TENTINI †
LITAI GILEOA
TAMARA DARWEESH
JULIA TSAI
JASON BROWN
ZUBIN FARINPOUR
PAUL MCCOLLUM
VICTORIA DUNNE
LAURA MCADAMS
CHRISTINE WALTON
V. APPLEN
GRETHCHEN COFFIN
ARDYS AVETISIAN
RODERIGO J. BEZGGITTAN
MIRIAM RENZE
MELISSA FARKAS
DANIEL FABIANO
SHANE MORRISON
JANETTE GLASER
LESLEY POWERS
ANGELA POWELL
ARI STILLER
ANDREY CHITA
MAX HIGGINS
MATTHEW WEINER
SEAN DOWNING
KYRA BUCH
MICHAEL LE
Of Counsel
DONALD S. SMITH•
THOMAS R. WAGNER

# MANNING&KASS
# ELLROD, RAMIREZ, TRESTER LLP
### ATTORNEYS AT LAW



15TH FLOOR AT 801 TOWER
801 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017
TELEPHONE: (213) 624-6900
FACSIMILE: (213) 624-6999
WEB SITE: WWW.MANNINGLLP.COM

May 16, 2014

*VIA E-Mail, Fax, and U.S. Mail*

Francisco A. Suarez, Esq.
Law Offices of Francisco A. Suarez
301 W. Mission Boulevard
Pomona, California 91766
*francisco.a.suarez@verizon.net*
Fax: (909) 469-5113

Jorge Gonzalez, Esq.
A Professional Corporation
2485 Huntington Drive, Suite 238
San Marino, California 91108
*jggorgeous@aol.com*

Re:  **Estate of Hutalio Serrano-Granados, et al. v. City of Colton, et al.**
  **Case No.:** CV13-00519-JAK
  **Incident Date:** 01/15/12
  **Our File No.:** 01815-039697

Dear Mr. Suarez and Mr. Gonzalez:

As you will recall, on the afternoon of May 5, 2014 a telephone conversation took place between between plaintiffs' counsel Jorge Gonzalez and defendant's counsel Mildred O'Linn and Tony Sain regarding the plaintiffs' designation of Ronald L. O'Halloran, M.D. as a plaintiffs' expert in the *Serrano v. Colton* case and the defendant's request that the plaintiffs voluntarily withdraw Dr. O'Halloran as an expert witness in that matter. We followed up that phone call with a letter on the same topic dated May 6, 2014. Mr. Gonzalez responded with a letter dated May 7, 2014, which concluded with his statement that "plaintiff hereby declines to withdraw Dr. O'Halloran as an expert, including his opinions and conclusions."

As we indicated in our May 6, 2014 letter, since the plaintiff did not voluntarily withdraw Dr. O'Halloran, we now intend to ask the Court to disqualify Dr. O'Halloran. Given that Dr. O'Halloran's opinions in this matter are unquestionably influenced by the

Francisco A. Suarez, Esq.
Jorge Gonzalez, Esq.
**Re:**   **Estate of Serrano-Granados v. City of Colton**
May 16, 2014
Page 2

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP

privileged and confidential information he was given by Tony M. Sain of this office during his lengthy conversation with Dr. O'Halloran, the two of you must also be presumed to have benefitted from that same knowledge, and so we are compelled to ask the Court to disqualify you as well from continuing to represent the plaintiffs in this action.

On Monday, May 19, 2014 we will be filing an ex parte application with the Court regarding this matter.  Ex parte consideration is necessary in light of the pending deadline for deposing expert witnesses.  We would prefer not to have to depose Dr. O'Halloran if he is to be disqualified from this matter.  We will be presenting three alternatives for the Court's consideration: to immediately address the merits of this dispute, to shorten time for the hearing of a motion on the merits (to be heard prior to the discovery cut-off date), or to set our ex parte application for hearing on normal notice for a motion and to extend the deadline for the defendant to depose the plaintiffs' expert witnesses to a date after the court rules on the ex parte application.  The grounds for our ex parte application will be those set out in our May 6, 2014 letter to you (a copy of which is attached for your convenience).

Please let us know by **noon on Monday, May 19, 2014** whether there is any portion of our proposed ex parte application that you would agree not to oppose, or whether you will be opposing it in its entirety.  We will include your position on this point in our application. We will serve you with a copy of the application when it is filed.  Please be advised that pursuant to Paragraph 3 of Judge Kronstadt's Initial Standing Order (and Paragraph 7 of his Procedures), any papers opposing the ex parte application "must be filed no later than twenty-four (24) hours (or one court day) following service."  Please call the undersigned if you have any questions or would like to discuss this matter.

Very truly yours,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

Mildred K. O'Linn, Esq.
Tony M. Sain, Esq.

G:\docsdata\MKO\Serrano\Letters PC letter Disqualification ex parte.051614.002.wpd

000057

E X H I B I T  H

# JORGE GONZALEZ

## A Professional Corporation

2485 Huntington Drive, Suite 238
San Marino, California 91108

Telephone: 213-598-3278                                    E-mail: jggorgeous@aol.com

May 19, 2014

Mildred K. O'Linn, Esq.
Tony M. Sain, Esq.
Steven J. Resnick, Esq.
MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
801 South Figueroa Street, 15th Floor
Los Angeles, California 90017

      Re:    Hutalio Serrano v. City of Colton
             USDC No.  CV 13-00519 JAK JEM

Dear Ms. O'Linn and Mssrs. Sain and Resnick:

    In response to the letter you delivered to me by email on Friday, May 16, 2014, after 5:00 p.m., I am advising you that I intend to oppose your Ex Parte motion to disqualify our Expert Dr. O'Halloran, and my law office on the same grounds noted in my letter to you dated May 7, 2014.

    In the first instance, serving me with such a notice at the time and date indicated are not what the Court requires as "reasonable notice."  It appears to be a habit of your office to serve important documents, letters, and motions late in the afternoon of the deadline set for filing.  For instance, the motion for summary judgment was filed with the Court, and thus, served on me electronically, at 5:58 p.m. on May 12, 2014.  Indeed, although the deadline for hearing dispositive motions had been earlier set for June 9, 2014, the hearing was originally set for July 7, 2014, and was advanced to the current date on the Court's motion, leaving me with a scant two weeks to file an opposition to the motion.

    Serving me with notice on a Friday after 5:00 p.m., that you intend to file an Ex Parte motion the following Monday is clearly **not** reasonable.

    Furthermore, as my earlier letter dated May 7, 2014, indicated my reasons for refusing to accede to your demand that I withdraw both Dr. O'Halloran and his expert report, I likewise will not agree to your proposals set forth in your letter of May 16, 2014.

    My letter clearly indicates Dr. O'Halloran and I discussed whether he'd had substantive discussions regarding Serrano with Mr. Sain, and we came to the conclusion nothing substantive or confidential of any nature was discussed.  We took great care to insure we were not "treading on thin ice" by entering into a working relationship.  Under the federal authorities cited in my letter, defendants must make a strong showing of being unduly disadvantaged by our having procured the services of Dr. O'Halloran.

000059

Because Defendants have used Dr. O'Halloran in the past, including a case we just settled together this past fall, I am sure defendants maintain a position of respect for Dr. O'Halloran's integrity and veracity, which I share.

In my humble opinion, this is an example of a "Goliath" defendant trying to intimidate and push a "David" defendant into submission.

Sincerely,

Jorge Gonzalez, Esq.

JG/jg

000060

## PROOF OF SERVICE
## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 801 South Figueroa Street, 15th Floor, Los Angeles, California 90017.

On May 20, 2014, I served the document described as **EX PARTE APPLICATION: 1) TO DISQUALIFY PLAINTIFFS' EXPERT RONALD L. O'HALLORAN, M.D. AND, IF THE COURT DEEMS APPROPRIATE, PLAINTIFFS' COUNSEL JORGE GONZALEZ; or, in the alternative 2) TO SHORTEN TIME FOR THE HEARING OF A MOTION REQUESTING SUCH RELIEF; or, in the alternative 3) SETTING THIS MATTER FOR HEARING ON NORMAL NOTICE FOR A MOTION AND EXTENDING THE DEADLINE FOR DEFENDANT TO DEPOSE PLAINTIFFS' EXPERT WITNESSES UNTIL A DATE AFTER THE COURT RULES ON SUCH A MOTION; DECLARATION OF TONY M. SAIN; DECLARATION OF STEVEN J. RENICK; EXHIBITS; [PROPOSED] ORDER** on the interested parties in this action as follows:

I emailed such document to the offices of plaintiffs' attorneys at the following email addresses:

| | |
|---|---|
| Jorge Gonzalez, Esq.: | *jggorgeous@aol.com* |
| Francisco A. Suarez, Esq.: | *francisco.a.suarez@verizon.net* |
| | *francisco.suarez.lawoffice@gmail.com* |

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on May 20, 2014, at Los Angeles, California.

*/s/ Steven J. Renick*

STEVEN J. RENICK

G:\docsdata\MKO\Serrano\Pleadings\Ex Parte Disqualification.003.wpd