# MEMORANDUM OF POINTS AND AUTHORITIES

## Introduction.

Defendants have filed a Motion for Summary Judgment alleging Plaintiffs' Claims for violations of civil rights and California tort claims should be denied for lack of any triable issues of material fact.  It should be noted that Plaintiffs have previously filed a Motion for Leave to Amend the Complaint, Substituting the True Names (of the police officers) for Fictitiously Named Defendants.  Defendants direct their motion only to the municipal defendant herein, but allege as a foundation that the actions of the officers were reasonable according to their version of the facts and prevailing police procedures.  Plaintiffs comprehensively address herein Defendant's claim of reasonableness, and demonstrate that serious disputes of material fact exist which must be tried by a jury.

## 1.    Statement of Facts.

On January 15, 2012, Gabriela Serrano and her children were staying with her parents in the City of Colton because her husband had recently been acting and behaving strangely.  During the afternoon, her husband Hutalio Serrano appeared. She told him to go home, she would return later.  Instead, he paced around outside the apartment, acting incoherently, and walking erratically in and out of traffic causing her to be concerned for his safety.  (GS 160)  She instructed her son Eduardo to call the police and ask for assistance, which he did.  (GS 165)

Within 10 minutes one police officer from the City of Colton arrived, officer Saul Salazar.  (GS 167)  He parked across the street and directed himself to Hutalio Serrano, who was standing in a parking lot.  The officer was aware that the call of a "suspicious person" involved someone who had been walking in and out of traffic.  (WH 41)  As he got out of the car he initially suspected the person might be mentally ill (WIC 5150) or under the influence of alcohol (PC 647f).  (SS 54-55)

He approached Mr. Serrano, who initially walked away.  (SS 45)  Officer
Salazar called for Serrano to come to him, using hand gestures to emphasize.
(EFA 83)  Serrano turned back and walked in the officer's direction.  (GS 180)
Salazar thought he was acting strangely and suspected he might be under the
influence of drugs.  (SS 62)  Salazar said something to Serrano.  (SS 86)  Salazar
began to yell loudly at Salazar to get down, mostly in English, despite the fact that
Serrano was answering him in Spanish.  (GS 180; BS 86)  Serrano went down to
his knees.  (SS 108)  Suddenly, Salazar struck Serrano in the upper body with a
flashlight.  (GS 183; TH 74)  Serrano immediately got up, but the officer
frantically continued yelling at him.  Serrano remained on his knees.  (GS 183-184;
WH 78-79)

A second Colton police officer (Wade Harris) arrived within 6-7 minutes of
Salazar's arrival.  (GS 176-177)  He immediately walked up to Serrano and kicked
him, then tried to push him down by pushing Serrano in the back with his two
hands.  (GS 192; EHA 87; WH 57-58)  The witnesses thought Serrano appeared
afraid of the police.  (GS 182; TH 73)  Both officers yelled loudly at Serrano,
mostly in English.  (EHA 88-89)  Serrano remained on his knees and moved
around as the officers tried to come up behind him, saying "Por favor," which both
officers understood to mean "Please."  (SS 111; WH 62)  The family members that
were observing thought Serrano appeared afraid, and unable to understand, and
was pleading with them to stop (as if not to hurt him), but the officers ignored his
pleas.  (GS 194; SS 92, 111, 119; WH 65-67)

Both officers drew their personal Electrical Control Devices (Tasers) and
pointed them at Serrano.  Once activated, the Tasers began to record in both a
video and audio mode.  (SS 79)  The recordings show the events for the next
minute or so, from both the vantage of Salazar and of Harris.  (Exhibit 11 to Def.
Mtn.)  The video clearly shows Serrano is on his knees on the ground at first,
moving about a bit with both his hands and his knees (he raises one knee at one

point and rubs it).  (WH 97)  He reached inside the chest of his sweatshirt and pulled out a crucifix, showing it to the officers.  (SS 65, 83)  At no time do the videos show Serrano coming to his feet or attempting to strike or assault the officers.  (RC 7)  At one point officer Salazar approached Serrano from the left side and appeared to grab his left arm.  Serrano turned toward the officer while on his knees and moved his right arm toward his left wrist, and suddenly, Harris immediately deployed his Taser in a dart mode at Serrano.  (Def. Ex. 11; WH 95, 152;  SS 183)

Serrano immediately fell to the ground, which is the expected reaction of a person being subjected to its electronic current, immobilizing them for the 5 seconds it is cycled.  (WH 97-98; SS 165)  Serrano began emitting noises as if he was in pain.  (EHJ 73-74)  Serrano returned to a kneeling position, pulling up his pants because they had gone down his backside.  (Def. Ex. 11)  The officers continued yelling at Serrano to Stop, but he wasn't being aggressive.  (EHJ 69)  Serrano rolled on the ground, and officer Harris yelled at Serrano to stop rolling.  (WH 10)  Officer Harris cycled his Taser again, then Salazar deployed his Taser.  He cycled it three more times, then Harris pulled the trigger again.  (SS 202; WH 14)  Serrano pleaded with the officers to Stop, yelling 'Por favor," over and over again.  (EH 114, EHJ 74; WH 86)  Despite being on the ground, the officers were yelling at him to "Get on the ground," again in English.  (WH 58, 90)  Even though he was on the ground, in a fetal position, the officers continued Tasing Serrano.  (EHJ 75, 79, 126; EH 114, 132-133)  They Tased Serrano a combined total of seven times within a 42 second period, one right after the other, without ever allowing Serrano an opportunity to comply with any of their orders.  (SS 158-159, 202; WH 140)

Salazar and Harris then jumped on top of Serrano, rolling him onto his stomach and attempting to handcuff him.  (SS 204, 211; WH 114, 114-116)  Sgt. Bornsheur arrived and joined in the effort.  The officers were on top of Serrano's

body from the waist up, trying to hold him down.  (EHJ 97, 99)  Witnesses saw that Salazar had his knee on Serrano's back.  (EHJ 76, 88)  Serrano appeared to struggle to push himself up, but the officers applied superior pressure to keep him pinned to the ground.  (EH 116, 135-141)  Officer Harris punched Serrano several times.  (WH 116, RB 72)  The officers exerted so much energy trying to keep Serrano down that they reported being totally exhausted.  (SS 215, 219, 245; WH 123-124; RB 63)  Salazar had to briefly step back to catch his breath.  (SS 24, 219, 240)

Officers put out on the radio "One cuffed but not secured."  (Def. Ex. 11)  Witnesses saw the officers continue to hold Serrano down even though he was already handcuffed.  (EHJ 95-96)  Suddenly, it appearing Serrano was no longer moving, the officers turned him over on his back to find he was lifeless.  A resident of the area yelled out "They killed him, he's dead!"  (EHJ 102-104; GS 216)  The officers began performing c.p.r. as they called for medical aid.  (SS 261)  Approximately 5 minutes had passed since the last Taser application.  (Ex. 11; RO pp.6)

Para-medics arrived within minutes of being summoned to find Serrano was asystolic (without pulse or breath).  (Def. Ex. 14, 15)  They first asked the officers to remove the handcuffs from Serrano, then began resuscitative efforts.  (EH 165, Def. Ex. 15)  They quickly transported Serrano to the hospital where life-saving efforts proved fruitless.

Serrano died of cardiac failure, which Ronald L. O'Halloran, M.D., the former Coroner of Ventura County, opined was due to "Restraint Asphyxia" because of the extensive compression on Serrano by the combined body weight of the officers while in a prone position, for two to three minutes.  (RO pp. 10-11)

**ARGUMENT**

**2.     The Standard on Summary Judgment is Whether Any Genuine Issues of Material Fact Exist Which Must be Determined by a Jury.**

The burden of a moving party under Rule 56, Fed. R.Civ. P., is to establish that there is no genuine issue of material fact.  The responding party, in this case plaintiffs, must then present sufficient evidence to show there are genuine issues of material fact which can only properly be resolved by a jury, and upon which a jury might reasonably rely to support their verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 244, 252, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).  Thus, the only inquiry is whether there is a genuine issue of material facts for trial, not the truth of the evidence or whether it favors one side or the other.  *Anderson, supra at 247-48.*

In considering defendants' Motion for Summary Judgment or Summary Adjudication, the evidence presented must be viewed in a light most favorable to the plaintiffs. See *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1511 (9th Cir. 1989); *Peacock v. Duvall*, 694 F.2d 644, 645 (9th Cir. 1982).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 252.  All reasonable doubts must be resolved against the defendants. See *Mahroom v. Hook*, 563 F.2d 1369, 1376 (9th Cir. 1977);  *Dahlke v. Upjohn*, 555 F.2d 245 (9th Cir. 1977).  When the determination of the issues requires a determination of the credibility of the parties and/or witnesses, summary judgment is inappropriate, as that is the province of the jury. See *Allen v. Scribner*, 812 F.2d 426, 437 (9th Cir. 1987).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth.  *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305-6 (9th Cir. 1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir. 1982).  All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists.  *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, & L.Ed.2d 458 (1962).  After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims.  *Admiralty Fund v. Tabor,* 677 F.2d 1297 (9th Cir.

1982).

To the extent that defendants bear the burden of proof on the defense of qualified immunity or other affirmative defenses, they must present such conclusive evidence in this motion. See *Celotex Corp. v. Catrette*, 477 U.S. 317, 321-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**3.    Plaintiff Gabriela Serrano Has Standing To Pursue All The Claims In This Action Under California Code Of Civil Procedure 377.60, As The Personal Representative Of The Decedent, Or As Survivor Of The Decedent Who Would Otherwise Be Entitled To Inherit His Property.**

**A.    Federal Law Authorizes § 1983 Fourth Amendment Claims To Be Brought As Wrongful Death Claims And Survival Claims As Permitted By California Law.**

While Title 42, U.S.C. § 1983 does not specifically address who has standing to bring an action for the death of another or what damages are recoverable in such an action, § 1988 (a) sets forth a three-step analysis for determining those issues:

> "First, courts are to look to the laws of the United States 'so far as such laws are suitable to carry [the civil and criminal statutes] into effect.' [42 U.S.C. § 1988.] If no suitable federal rule exists, courts undertake the second step by considering application of state 'common law, as modified and changed by the constitution and statutes' of the forum State. A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not 'inconsistent with the Constitution and laws of the United States.'"

*Golden State Transit Corp. v. City of Los Angeles*, 773 F.Supp. 204, 208 (C.D. Cal. 1991), quoting *Burnett v. Grattan*, 468 U.S. 42, 47-48, 104 S. Ct. 2924 (1984). Or, as the Supreme Court explained, **"This means, as we read § 1988, that both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes."** *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240 (1969) (emphasis added).

The policies behind § 1983, which is derived from the Civil Rights Act of 1866, are simple: "The basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1977).  "Deterrence of future egregious conduct" is also "a primary purpose of §1983."  *Smith v. Wade*, 461 U.S. 30, 49 (1983).  Section 1983's "unique remedy makes it appropriate to accord the statute a sweep as broad as its language."  *Wilson v. Garcia*, 471 U.S. 261, 272 (1985).

The High Court has further explained,

> Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.  And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.
>
> *   *   *
>
> The existence of a statutory right implies the existence of all necessary and appropriate remedies.

Sullivan, 396 U.S. at 239.

In the Ninth Circuit and California courts have repeatedly held that where a person has been killed by police excessive force, a § 1983 Fourth Amendment claim can be brought pursuant to both wrongful death and survival statutes.

California provides a wrongful death claim for certain persons, including a spouse or children, "for the death of a person caused by the wrongful act or neglect of another."  Here, the wrongful act of the Defendants was their violation of Hutalio Serrano's Fourth Amendment right to be free from unreasonable deadly force.  The Plaintiffs' right to a statutory wrongful death claim (with statutorily enumerated damages) for Defendants' "wrongful act" causing Serrano's death is created by state statute: C.C.P. § 377.60.  As in any wrongful death case, the "wrongful act" is done to the decedent, not to the Plaintiff, and is a violation of the decedent's rights.

The wrongful death damages allowed under C.C.P. § 377.60 include recovery for loss of love, companionship, comfort, affection, society, solace or

moral support, and any loss of enjoyment of sexual relations, as well as all
financial losses suffered by the survivors, including loss of financial support and
services provided by the decedent.  The survivors' grief and sorrow is not
compensable.  California Approved Jury Instructions (CACI), 3921; *Krouse v.
Graham*, 19 Cal.3d 59, 137 Cal.Rptr. 863 (1977).

California and federal law also allow a "survival claim" to be brought by
"successors in interest" to the decedent.  C.C.P. §§ 377.20; 377.30.  A survival
claim also is based on a violation of the decedent's rights.  Id; C.C.P. § 377.34.

California law specifically authorizes both wrongful death and survival
claims to be joined, as they arise "out of the same wrongful act or neglect.  *See*,
Cal. Code Civ. Proc. § 377.62.  **Joinder with decedent's cause of action**:

(a) An action under Section 377.30 [survival claim] may be joined with an
action under Section 377.60 [wrongful death claim] **arising out of the
same wrongful act or neglect**.

(b) An action under Section 377.60 and an action under Section 377.31
arising from the same wrongful act or neglect may be consolidated for
trial as provided in Section 1048.

(Emphasis added).

California and Ninth Circuit Courts have repeatedly held that survivors of a
decedent who otherwise meet the requirements to bring state wrongful death or
survival claims are entitled to bring Fourth Amendment claims for violation of the
decedent's rights that caused death.

For example, in *Alvarez v. Wiley*, 71 Cal.App.3d 599 (1977), the California
Court of Appeal found that in § 1983 cases, Congress intended "to adopt as federal
law the forum state's law on survival of claims for wrongful death."  71
Cal.App.3d at 604.  Thus, in a § 1983 case brought in state court, an heir is entitled
to wrongful death damages pursuant to C.C.P. § 377 [the predecessor statute, now
amended at § 377.60].  71 Cal.App.3d at 605.

Similarly, in *Garcia v. Superior Court*, 42 Cal. App. 4th 177 (1996), the state court declined to follow federal cases providing for conscious pain and suffering and loss of life, because it concluded damages available for a federal civil rights claim in California – both survival *and* wrongful death – were adequate: "In determining whether California law is consistent with the federal Civil Rights Act, it is appropriate to consider the state provisions not only for survival of decedent's action but also for the survivors' wrongful death action."  42 Cal. App. 4th at 187.

Plaintiff's Fourth Amendment wrongful death claim survives the death of the decedent.  The Ninth Circuit explained in *Sposato v. Electronic Data Systems*, 188 F.3d 1146, 1149 (9th Cir. 1999), "California enacted a [sic] comprehensive survival statutes for personal tort and wrongful death actions."  The Court stated that this comprehensive system provides for both limited "survival" damages and more substantial "wrongful death" damages, citing *Garcia*, 42 Cal. App. 4th 177 (1996), discussed above.  *Id.*

The Ninth Circuit and various District courts also have found wrongful death damages available to heirs of a decedent in § 1983 Fourth Amendment death cases. *See, Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 370 (9th Cir. 1998) (Fourth Amendment claims for death can be brought pursuant to C.C.P. § 377.60 by "any of a defined list of persons that includes a decedent's spouse, children or heirs").  *See also*, *Guyton v. Phillips*, 532 F.Supp. 1154, 1167 (N.D. Cal. 1981) ("Under California law, a wrongful death action may be brought" in 4th Amendment police shooting case); *Davis v. City of Ellensburg*, 651 F.Supp. 1248, 1257 (E.D. Wash. 1987) (allowing wrongful death claim in § 1983 action); *Galindo v. Brownell*, 255 F. Supp. 930 (S.D. Cal. 1966) (wrongful death damages "necessary to render the Civil Rights Act fully effective"); *Venerable v. City of Sacramento*, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002) (considering damages "provided by the California survival and wrongful death statutes, the court finds

that state law is not inconsistent" with federal law); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1145-1146 (E.D. Cal. 2005).

**B.** **Plaintiff Gabriela Serrano has Properly Filed a Probate Action to Administer the Estate of Hutalio Serrano.**

On May 22, 2014, Plaintiff Gabriela Serrano opened a probate case in the Superior Court of San Bernardino County asking the court to name her as the personal representative of the Estate of Hutalio Serrano.  (See Exhibit C).  She submits that being named the personal representative of the Estate of Hutalio Serrano Granados after the statute of limitations expired does not preclude her from maintaining the Estate's cause of action.  The original complaint was timely filed and set forth all the facts relating to the Estate and its damages. Thus, the filing as the personal representative will "relate back" to the original filing of the Complaint.

A survivor claim is a statutory cause of action; however, unlike a wrongful death claim, the survival statutes do not *create* a cause of action but merely prevent the abatement of the decedent's cause of action and provide for its enforcement by the decedent's personal representative or successor in interest.  §§ 377.20, 377.30; *Grant v. McAuliffe*, 41 Cal.2d 859, 864 (1953).  Damages for a survivor claim include punitive damages and all the decedent's losses incurred prior to death, but exclude any award for the decedent's pain or suffering. § 377.34

"Where there is no attempt to state a new cause of action in an amended complaint, but merely the **addition of matters essential to make the original cause of action complete**, the **amendment, though made after the expiration of the period of limitation, relates back to the time of the commencement** of the action." *Mayo v. White*, 178 Cal. App. 3d 1083 (1986), quoting *Ruiz v. Santa Barbara Gas Co.*, 168 Cal.188 (1912)  No issue would have been changed by the amendment.

Motions to amend pleadings to the end that justice may be promoted are to be

liberally granted. Especially should liberality be exercised in favor of allowing the amendment where, as in the instant case, the amendment would not state a new or different cause of action from that attempted to be stated in the original complaint. (*Barr v. Southern California Edison Co.,* 24 Cal.App.2d 22 (19 *).

Here, the original complaint included a *timely* filed survivor cause of action and Mrs. Serrano's completion of her Estate documents naming her as the personal representative tendered no new claims or issues and does not seek to enforce an independent right.  The relation-back doctrine deems a later-filed pleading to have been filed at the time of an earlier complaint which met the applicable limitations period, thus avoiding the bar. In order for the relation-back doctrine to apply, the amended complaint must (1) rest on the same general set of facts, (2) involve the same injury, and (3) refer to the same instrumentality, as the original one, which clearly this case does.  Mrs. Serrano clearly has the legal capacity to prosecute this action.

**4.** **The Colton Police Department Failed To Train Their Officers In How To Handle Situations Involving Mentally Disturbed Individuals, And Their Failure To Do So Caused The Constitutional Violations Herein.**

A "policy" is "'a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Oviatt v. Pierce,* 954 F.2d 1470, 1477 (9th Cir. 1992) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). A "policy" can be one of action, *see Monell v. Dept of Social Services,* 436 U.S. 658, 661 (1978) (forcing women to take early maternity leave), or inaction, *see City of Canton v. Harris,* 489 U.S. 378, 387 (1989) (failure to train); *Oviatt, supra,* 954 F.2d at 1477 (failure to implement adequate procedural safeguards).

In *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992) the court concluded a city could be liable for civil rights violations for improper training or improper

procedures.  The holding in *Hopkins* is especially compelling in this case where Plaintiffs are complaining that officers called on to assist a mentally disturbed individual so improperly handled the situation that within several minutes of being called to the location they had killed him.

> "The police chief and city might be held liable for improper training or improper procedure even if Andaya is exonerated, since they put an officer on the street who is so badly trained and instructed he lets his baton be taken away from him and then has to kill an unarmed civilian to save his own life. Andaya has a history of citizen complaints of excessive force, a reputation for being quick-tempered, and has drawn or fired his gun inappropriately several times before. These facts would certainly bear on whether the city properly trained Andaya, and whether they should have sent him out on the streets carrying a weapon." *Id.* at p. 888.

In the instant case, the Decedent's wife asked her son to call the police out of concern for her husband's welfare.  He had been acting strangely for days.  He acted incoherently on the date of the incident.  Even officer Salazar admits that Serrano was not acting appropriately or rationally from the moment he first encountered him.  (SS 98)  He claimed to know that mentally ill or people under the influence of drugs are easily agitate, and he needed to approach Serrano calmly in an effort to de-escalate the situation.  (SS 100, 103)  However, witnesses all agree he did exactly the opposite.  He yelled at Serrano, primarily in English despite knowing Serrano was a Spanish speaker, and despite not giving orders that were clear, he became angry at Serrano when he didn't get on the ground (sit?).  He struck Serrano twice with a flashlight in the upper body when Serrano got on his knees, seemingly in an effort to do what he perceived the officer wanted of him.

Then when Harris arrived the two of them continued treating Serrano in an aggressive manner, both yelling commands at him that they interpreted as not being complied with, despite various indications Serrano didn't understand.  Then they Tased Serrano without any indication that they were in imminent danger, nor that Serrano was actively trying to resist them or flee.  Yet, they ignored obvious indicators that Serrano was afraid, his lack of aggressiveness, his repeated pleas not to hurt him (Por favor, por favor), and that he remained on his knees almost the entire time they were dealing with him.  Furthermore, in apparent contradiction of Colton policies, they repeatedly deployed the Taser, over and over again, seven times in 42 seconds, in what can only be described as malicious torture.

Salazar and Harris were patently acting directly in contravention of their own departmental policies regarding not using the Taser against a person who was not actively resisting, nor to gain compliance over persons who are not presenting a credible threat to the safety of the officers.  (SS, 14, 146)  Nor, for that matter, does it appear he knows the difference between a passive and active resistance.  (SS 150, 151)   They also violated their policy of repeated, successive use of the Taser without giving the person an opportunity to comply, (SS 160, 161, 192) or, if the ECD does not appear to be effective, to transition to another alternative method of compliance.  (SS 189)

Furthermore, Salazar admits he has not had training on how to prevent positional asphyxia, except for hogtying.  (SS 252)

Yet, the Colton Police Department never initiated an internal investigation of the actions of the officers herein.  Harris specifically denies having been interviewed by anyone, including Watch Commanders, Watch Sergeants, or other superiors from the Colton Police Department.  (WH 21)

Roger Clark has opined that the Colton police officers here acted contrary to the training all police officers receive to follow and the POST standards in the state of California, in regards to their use of force, the dealing with a mentally ill person, and the potential for positional asphyxia. (Roger Clark pp. 7-17). Plaintiffs have demonstrated sufficient evidence of the lack of training or supervision to create a genuine dispute of a material fact on this issue.

**5.   Gabriela Serrano has Standing to Pursue a Claim on behalf of Decedent under California Civil Code § 52.1.**

Defendants claim Plaintiffs have not properly brought a claim under California Civil Code § 52.1.

They argue primarily that Plaintiff cannot show a violation based on the suggestion that the rights interfered with as described in the complaint are not "rights actually secured" under the California or United States Constitution. Suffice to say they emphasize the wrong issue as to whether Plaintiff has a cognizable claim under that statute.

Indeed, in *Venegas v. County of Los Angeles*, 32 Cal.4th 820 (2004), the California Supreme Court recognized that the plaintiffs therein had properly alleged a violation based on an unconstitutional search and seizure accompanied by threats, intimidation or coercion. *Id.* at 843. The court opined that it should not be difficult to frame many statutory or constitutional violations as incorporating a threatening, coercive, or intimidating verbal or written component. *Id.* at 851.

In *Gant v. County of Los Angeles*, 765 F.Supp.2d 1238 (2011), the court found 52.1 requires a showing of coercion independent from the coercion inherent in a wrongful detention. Compare, in *Cole v. DOE I and 2 Officers of the Emeryville Police Department*, 387 F.Supp.2d 1084, the court held the "[u]se of law enforcement to effectuate a stop [and] detention . . .

can constitute interference by threats, intimidation or coercion," if the officer lacks probable cause.

In *Richardson v. City of Antioch* (2010),722 F.Supp.2d 1133, the issue of what constituted a basis for § 52.1 violation was examined (there its was an unconstitutional entry that was complained of). The court held the "test is whether a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the actions of the [officers] and have perceived a threat of violence." See also *Uganda Knapps v. City of Oakland* (2009), 647 F.Supp.2d 1129 (evidence that excessive force was used in connection with Fourth Amendment violation was sufficient to establish violation of § 52.1).

Here, Plaintiff alleges several aspects to the incident that constitute "threats, intimidation, or coercion," including the aggressive manner in which the officers confronted Serrano, when they knew (or should have known) he was suffering from a mental disturbance, with the use of excessive force (blows and threats, and use of Taser and body compression during handcuffing process).

### A.   The Claim for Damages Filed Herein Was Sufficient.

Under the California Tort Claims Act (CTCA), a plaintiff may not maintain an action for damages against a public entity unless a written claim has first been presented to the appropriate entity and has been acted upon by that entity before filing suit in court. See Cal. Gov't Code §§ 905, 945.4, 950.2; *Mangold v. California Pub. Utilis. Comm'n.*, 67 F.3d 1470, 1477 (9th Cir. 1995). State law claims brought in federal court pursuant to 42 U.S.C. § 1983 are subject to dismissal for failure to allege compliance with the claim-filing requirement of the CTCA. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 627 (9th Cir. 1988). The CTCA applies to state law claims wherever those claims are brought, and the requirement that a plaintiff must affirmatively allege compliance with the CTCA applies in federal court. *Id.* "Complaints that do not allege facts

demonstrating either that a [tort] claim was timely presented or that compliance with the claims statute is excused are subject to [dismissal]." *Shirk v. Vista Unified Sch. Dist.*, 42 Cal.4th 201, 209 (2007); *Superior Court (Bodde)*, 32 Cal.4th at 1243 (    *) (plaintiff must allege facts "demonstrating or excusing compliance with the claim presentation requirement"); see also *Gurrola v. Cnty. of Los Angeles*, 153 Cal.App.3d 145, 153, 200 Cal.Rptr. 157 (1984) ("'timely compliance with the claim filing requirements . . . must be pleaded in a complaint in order to state a cause of action'").   The CTCA requires that, before filing suit, an individual seeking to recover in tort against a public entity for claims relating to death or injury to a person must present the claim to the entity "not later than six months after the accrual of the cause of action." Cal. Gov't Code §§ 905, 911.2, 945.4. State law tort causes of action generally accrue when the wrongful act is committed.  *Collins v. Cnty. of Los Angeles*, 241 Cal.App.2d 451, 454, 458, 50 Cal.Rptr. 586 (1966).

The claim for damages in this action was timely filed on July 12, 2012 (the complaint erroneously states July 17, 2012, but postal receipts attached as Exhibit * prove the actual date of mailing).  It was rejected by the City of Colton on November 28, 2012 (Exhibit *).  Therefore, the complaint in this action having been lodged on March 21, 2013 (pending approval of the application for G.A.L. for the minors) and formally Filed on May 21, 2013 (Document 1), the complaint was also timely filed within six months of the denial of the claim.

**B.   The Complaint did not Exceed the Scope of Plaintiff's Section 910 Claim.**

Plaintiff next addresses Defendants' arguments that Plaintiffs "have impermissibly exceeded the scope of their tort claim." Under the CTCA, plaintiffs may not allege causes of action that are not reflected in their Section 910 claim. See *Stocket v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth*., 34 Cal.4th 441, 447, 99 P.3d 500 (Cal. 2004). The Section 910 claim need not specify each

particular act or omission later proven to have caused the injury. *Id*. A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an "entirely different set of facts." *Id*. Only where there has been a "complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim," have courts generally found a complaint barred. *Id*. (internal citations omitted). Where a complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint. *Id*.

In this case, although not very elaborate or detailed, Plaintiff's Claim for Damages clearly placed Defendant on notice of the nature of the claim, primarily alleging excessive use of force, and that it would be based on various constitutional violations, as well as intentional and negligent torts and vicarious liability.  It clearly alleges excessive force, the use of the Taser, and the handcuffing of the Decedent, all of which are factual matters further elaborated on through the course of the litigation, but all related to the nature of the claim as originally filed.

Furthermore, the names of the wife and children were sufficiently set out to make clear they were making a claim regarding the interference with the familial association.  Using the specific magic words is not required.

Summary Judgment is clearly not appropriate as to the 52.1 claim. Plaintiff does not oppose dismissal of the claim under Article 1, Section 13 of the California Constitution.

**6.    The Right of the Decedent to Be Free of Unreasonable Force Was Violated.**

**A.    The Officers Herein Failed in Dealing with Mentally Disturbed Person.**

A subject's mental illness must be considered in assessing any governmental interest in the use of force, "insofar as increasing the amount of force used to subdue a mentally imbalanced individual 'may, in some circumstances at least exacerbate the situation.'" *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003), citing *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001)).

In this case numerous indicators of Serrano's potential mental illness were described to the Colton Police's Department when the son called dispatch, including that he was walking in and out of traffic putting himself in danger. Salazar admits he knew this information before making contact with Serrano, but as pointed out herein, dealt with Serrano in hostile, belligerent, and provocative manner likely to cause him fear of his own personal safety, and as a result, a certain amount of resistance and uncooperativeness.  From start to finish, both individually and collectively, the officers failed to properly address the situation and acted in such an aggressive manner that they drove the final result.  See *Billington v. Smith*, 292 F.2d 1177 (9th Cir. 2002); *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994).

**B.   The Use of Force Must be Reasonable**

Claims for excessive force are analyzed under the Fourth Amendment's prohibition against unreasonable searches and seizures using the framework articulated in *Graham v. Conner*, 490 U.S. 386 (1989).  Police officers may only use such force that is objectively reasonable under the circumstances, viewing the facts from the perspective of a reasonably trained officer on the scene.  *Id*. at 396. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Ibid*.  (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

Courts must first look at the nature of the intrusion based on the type and amount of force inflicted. *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). They must assess the gravity of the particular intrusion on Fourth Amendment interests. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Then they must consider the importance of the governmental interests at stake. *Id*. Finally, the courts must "balance the gravity of the intrusion against the government's need for that intrusion to determine whether it was constitutionally reasonable. To do so, they apply the *Graham* factors by looking at the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle v. Rutherford*, *supra,* 272 F.3d at 1279-80. "These factors, however, are not exclusive. Rather, [the court must] examine the totality of the totality of the circumstances and consider 'whatever specific factors may be appropriate in a specific case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

Ultimately, the most important Graham factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates, supra*, 27 F.3d at 1441.

In this case, certain key facts underlie the situation posed to the officers:

• It is uncontested that Hutalio Serrano was not an armed subject during his initial encounters with officers, nor was the call regarding violence or injury to other persons.

• Mr. Serrano had not threatened or attacked anyone during the entire time from when he was first observed to the time that he died.

• There was ample tactical time and space for responding officers called to the scene to move as needed to tactically avoid any direct physical contact

with Mr. Serrano and to use alternative methods of dealing with him.  (Roger Clark, pp. 11-12)

Furthermore, to any reasonably trained officer Mr. Serrano's actions clearly indicated that he was experiencing a mental crisis.  Deputies failed to follow the necessary tactics and techniques in dealing with mentally ill subjects.  (Roger Clark, page 11-12)

A key aspect of this incident was the failure of the responding officers to follow the POST standards and training regarding officer contacts with subjects who have a mental illness.  A mentally ill person failing to immediately obey commands is a situation encountered by law enforcement officers on a relatively frequent basis.  There are indications in this case that the responding officers approached and treated Mr. Serrano with the expectation that he would respond to their orders with fairly routine compliance.  Their expectations and related tactics regarding Mr. Serrano were unrealistic and contrary to their POST training.  It was clear from the onset of the officers' arrival that Mr. Serrano was suffering from a mental illness (or under the influence of drugs, which requires similar treatment). There are clearly defined tactical necessities set forth by POST and required by law (13515.25 PC and 5150 WIC).  In this regard their individual and collective acts contrary to the professional standard were directly connected to Mr. Serrano's death.

The POST standards establish that officers dealing with mentally impaired individuals are to calm the situation, to communicate with the individual, to be truthful, and are not to make threats.  To calm the situation, as Roger Clark instructs, among other things the officers are trained to move slowly; assume a quiet nonthreatening manner when approaching and conversing with the individual; avoid physical contact if no violence or destructive acts have taken place, if possible; explain intended actions before taking action, if possible; take time to assess the situation; provide reassurance that officers are there to help; and

give the person time to calm down.  (Roger Clark, pp. 12-13)

Officers are also trained not to threaten the mentally ill individual with arrest or in any other manner.  Officers are trained that threats may create additional fright, stress, or potential aggression.  Officers are trained that as the stress level increases the ability for the mentally ill subject to understand orders and/or comply decreases accordingly.  In the opinion of police procedures expert Roger Clark, had responding officers followed these tactics, "it is more likely than not that the use of force that occurred would not have been necessary."  (RC,  pp. 13)

Instead, officers Salazar and Harris aggressively approached Mr. Serrano trying to get him to submit to their authority.  He got down on his knees and only got up when they struck him with a flashlight.  He never acted aggressively toward the officers (notwithstanding Harris' insistence that getting up off the ground after he knocked him down was "aggressive").

**C.   The Use of Taser Against Serrano Was Unreasonable Under the Circumstances**

The Taser is considered a "significant level of force" requiring a strong governmental interest to justify its use.  Given the totality of the circumstances confronting the officers the use of a Taser was not justified.  See *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (citing *Bryan, supra*, 360 F.3d at 826); *Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1168 (E.D.Cal. 2008); *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144 (W.D.Wash. 2007).  ("[W]here there is no need for force, any force used is constitutionally unreasonable."). *Headwaters Forest Def. v. County of Humboldt*, 211 F.3d 1121, 1133 (9th Cir. 2000), vacated on other grds by *County of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).  Before Harris arrived, Serrano had not violated any laws other than being a 5150, or a 647f or 148.  (SS 97)  Despite the exaggerated claims of the officers there was no credible threat to the safety of the officers or the community when they threatened him with the Taser, and then deployed it.

The suspicion that Serrano was under the influence of drugs or that he was not complying with their commands was not so serious as to compel the use of significant force, particularly if the suspect does not display any indicia of being violent or threatening. *Mattos, supra*, 661 F.3d at 433; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not severe crimes); *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir. 2005) (suspect reported to have struck wife was not particularly dangerous and his offense was not especially egregious). In *Bryan, supra*, the court found that though a suspect's volatile and erratic conduct might cause an officer to be wary, this did not, by itself, justify the use of significant force. *Id*. at 826.

The parties "relative culpability" *i.e.,* which party created the dangerous situation and which party is more innocent, may also be considered. *Scott, supra* 550 U.S. at 384, 127 S.Ct. 1769. Finally, the Ninth Circuit Court of Appeals has often held that in police misconduct cases, summary judgment should only be granted "sparingly" because such cases often turn on credibility determinations by a jury. *Espinoza v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Drummond, supra,* 343 F.3d at 1056).

The lesson of *Deorle* and *Drummond* is clearly presented here; the actions of the officers were overly aggressive, provocative, and possibly caused Serrano to react in fear and shield himself. Their actions were independent and reckless uses of force, and have a direct causal relationship to the end result.

The use of the Taser seven times against Serrano was certainly a seizure (*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002)), and was done without a strong governmental interest to justify it. *Mattos v. Agarano*, *supra,* 661 F.3d 433.

More importantly, this use of force and attempt to subdue Serrano when he was clearly experiencing a mental breakdown was very provocative, and exactly the opposite of what a well-trained officer would do in such circumstances.

Salazar was unable to show that he had anything other than elementary training on how to handle mentally ill subjects in the Academy, some eighteen years earlier. (S *) That he acted contrary to such training is almost without dispute.

**D.    The Officers Used Unreasonable Force During the Effort to Handcuff Serrano, Leading to His Untimely Death**

In *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), a similar situation was found where the officers used their body weight to deprive a mentally unstable person of oxygen, thus finding the force used was excessive.  It is worth noting that in *Drummond* the subject (deceased) repeatedly told the officers he could not breathe, and that he was thirsty and needed water, just as here.  *Id.* 1054-55.  Also, the subject died, according to the evidence, from a cardiopulmonary arrest caused by the lack of oxygen to his heart.  *Ibid.*

**E.    The Court Should Treat the Officers' Claims With Skepticism.**

The courts acknowledge that to overcome a motion for summary judgment, "the Judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott v. Henrich*, 978 F.2d 481, 484 (9th Cir. 1992), citing *Hopkins v. Andaya*, 958 F.2d 881, 885-88 (9th Cir. 1992).  "In other words, the court may not simply accept what may be a self-serving account, but must exercise a fair degree of skepticism in determining whether the officer – as sole surviving witness and intensely interested party – is telling the truth.  *Scott, supra,* 978 F.2d at 484. Furthermore, the interpretations and purported beliefs of the defendant officers are not material, as they are not objectively observable facts, and constitute sheer speculation.  *Graham v. Conner*, 490 U.S. 386, 387 (1989).

**7.    Defendant's Claim that Plaintiffs' Claim for Negligence is Insufficient Should be Rejected.**

An unlawful seizure or use of excessive force also will support a negligence claim under California law. *Hernandez v. City of Pomona* (2009) 46 Cal. 4th 501, 513-514 (state law negligence claim is based on the same standard as Fourth Amendment excessive force claim). False arrest and improper search can also support negligence liability against an officer. *Venegas v. County of Los Angeles, supra,* 153 Cal. App. 4th at 1249-52. *See also, Robinson v. Solano County, supra*, 278 F.3d at 1016-17 (California negligence claim allowed to proceed along with allegations of false arrest and excessive force); *Blankenhorn v. City of Orange*, 485 F.3d 463, 486-88 (9th Cir. 2007) (same).

Indeed, a recent Ninth Circuit opinion dealt with the issue of duty and breach of duty when it comes to civil rights cases. In *Hayes v. Cnty of San Diego,* 658 F.3d 867 (9th Cir. 2011), the court examined the issue of whether pre-shooting conduct should be considered in a negligence claim, where examining the actual use of lethal force in isolation might preclude a excessive use of force claim under federal law. They remanded the issue back to the California Supreme Court for an interpretation under California law.

The California Supreme Court then held that the concept of duty, under state negligence law, encompassed "the totality of circumstances" confronting the officers when determining whether they breached their duty.

Finding that "in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty of San Diego*, 57 Cal.4th 622 (2013), citing *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292; see *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.

Peace officers have a duty to act reasonably when using deadly force. *Munoz v. Olin* (1979) 24 Cal.3d 629, 634; *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587. The reasonableness of an officer's conduct is determined in light

of the totality of circumstances.  *Grudt, supra* at 585-88 (other citations omitted).  The shooting in *Grudt* appeared justified *if examined in isolation.*

The holding in *Grudt*  clarified that pre-shooting conduct is included in the totality of circumstances surrounding an officer's use of deadly force, and therefore the officers' duty to act reasonably when using deadly force extends to preshooting conduct.  *Grudt, supra* at 585-588.

"Law enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability.  Such liability can arise, for example, if the tactical conduct and decisions show, as a part of the totality of the circumstances, that the use of deadly force was unreasonable."  (Resolving the pure legal question of the duty posed and leaving the factual question of any breach of that duty to the federal courts to determine.  *Hayes v. Cnty of San Diego, supra*, 57 Cal.4th at *.

### CONCLUSION

Based on the foregoing arguments, the attached Statement of Genuine Disputes of Material Fact, the attached Declarations, and accompanying Exhibits, Defendant's Motion for Summary Judgment should be DENIED except as to those issues Plaintiffs concede herein.

Dated: May 26, 2014                     LAW OFFICES OF JORGE GONZALEZ


                                        By:          /S/

                                        Jorge Gonzalez


                                        One of the Attorneys for Plaintiffs
                                        ESTATE OF HUTALIO SERRANO-
                                        GRANADOS, GABRIELA SERRANO, and
                                        Minors B.S., G.L.S., and G.S.